# September Term, 1897.

## CHARLES TOWN.

EASTHAM v. HOLT, JUDGE.

(McWHORTER, JUDGE, *concurring.*)

(ENGLISH, PRESIDENT, and DENT, JUDGE, *dissenting.*)

Submitted September 3, 1897—Decided September 14, 1897.

43  599
43  638
43  599
f50  53
f50  73

1. PROHIBITION—*Abuse of Power—Jurisdiction of Court.*
   Prohibition. When it lies for abuse of power when court has jurisdiction. (p. 601.)

2. GRAND JURY—*Discharge of Grand Jury—New Grand Jury List.*
   Grand Jury. When it may be discharged. Does its improper discharge impair indictment by a subsequent jury? How many can there be at regular or adjourned term? When court may order new grand jury list. (p. 602.)

3. GRAND JURY—*Talesmen—Statutes—Common-Law.*
   Grand Jury. Organization of. Can circuit court test the qualifications of those on the list? Does formation or expression of opinion disqualify? Excusing them. Talesmen. Must they come from the county court list exclusively? Does the statute as to selection and summoning grand jurors exclude wholly the common-law method and powers of the court? Does excusing a competent grand juror impair indictment if his place is filled by a competent one? (p. 605.)

4. GRAND Jury—*Challenge to the Array—Evidence.*

Grand Jury. Is there a right to a challenge to the array or polls, or must objection be by plea in abatement? Can accused ask a particular charge, or except to the charge? Has his counsel the right to discuss questions as to competency or organization? Has defendant the right to send witnesses to grand jury? Can grand jury hear evidence other than that of state? (p. 617.)

5. GRAND JURY—*Indictment—Murder—Manslaughter.*

Grand Jury. Is a charge that where a homicide is proven, and no circumstances of excuse appear, it is proper that the indictment should be for murder, erroneous, in not saying that the jury have power to find an indictment for manslaughter? Does it affect an indictment for murder? (p. 615.)

6. INDICTMENT—*Bias of Judge.*

Does bias of the judge impair an indictment? (p. 615.)

7. DISCHARGE OF ACCUSED—*Nolle Prosequi.*

Discharge of Accused. When he is entitled to, if not indicted, or on *nolle prosequi.* (p. 617)

8. JUDGE—*Abuse of Power.*

Will keeping a grand jury in custody of sheriff, or refusing to bail, or refusing to sign exceptions as to formation of grand jury, show such abuse of power by judge as to impair indictment? (p. 612.)

9. CONSTITUTIONAL LAW—*Prohibition.*

Is the statute giving power to a single judge of Supreme Court to award a rule in prohibition constitutional? (p. 620.)

Petition of one Eastham for a writ of prohibition directed to one Holt, judge of the Circuit Court. Writ denied by operation of law, because of a divided Court.

*Denied.*

C. W. DAILEY, F. M. REYNOLDS, MARSHALL McCORMICK, C. O. STRIEBY, J. T. McGRAW, W. B. MAXWELL, H. G. MOFFETT, and F. C. REYNOLDS, for petitioner.

A. G. DAYTON, J. J. DAVIS, JOHN A. HOWARD, WM. C. CLAYTON, A. M. CUNNINGHAM, A. B. PARSONS, and WM. G. CONLEY, for respondent.

BRANNON, JUDGE :

Eastham was indicted in the Circuit Court of Tucker County for the murder of Thompson, and he obtained from a judge of this Court a rule against the judge of the cir-

cuit court of that county to show cause why a writ of prohibition should not be awarded to him to prohibit the circuit court from further proceeding upon said indictment. The State of West Virginia moves to discharge that rule as improvidently awarded, and thus we have the question whether prohibition lies in this matter. This Court has repeatedly laid down, in harmony with the law elsewhere, that the writ of prohibition lies only where the inferior court is entertaining a cause where it has no jurisdiction, or where, having jurisdiction, it abuses that lawful jurisdiction, and there is no other adequate remedy, and that it does not lie where other processes answer the demands of justice according to the usual legal procedure. Observe that, to warrant prohibition, two things must concur : (1) That the court has no jurisdiction, or is abusing its lawful jurisdiction; and (2) that there is no other remedy to correct its error. Code 1891, c. 110, s. 1; *County Court* v. *Boreman,* 34 W. Va. 362 (12 S. E. 490), and citations. No one can or does question that the Circuit Court of Tucker has jurisdiction to impanel a grand jury to inquire of and prefer an indictment for murder, and to try the case upon such indictment, or that it had jurisdiction in this particular instance ; but the claim of Eastham's counsel is that, though that court had lawful jurisdiction of the subject-matter, yet that in the action of the court in the formation of the grand jury, and the bias and prejudice of the judge manifested in dealing with the grand juries while considering the case, and in other respects, the court abused and exceeded its lawful power, rendering the very indictment itself no indictment in law,—a mere nullity. Let us see whether the circumstances do make this indictment a mere blank in law ; for, if it is not such, a prohibition can not be allowed.

A grand jury indicted Eastham for involuntary manslaughter,—a misdemeanor ; and the prosecuting attorney, thinking that he should be tried for a higher grade of offense, dismissed this indictment by *nolle prosequi.* The court then made an order directing the county court to meet, and make up a list of persons from which grand jurors were to be drawn, and adjourned until an adjourned term, when a grand jury was impaneled, and reported that they could not agree to find "A true bill," or "Not a true

bill," and were adjourned until the next morning; and, as the judge's answer to the rule says, after the adjournment the prosecuting attorney called on the judge, and stated that the foreman had requested him to say to the judge that it was useless to hold the grand jury longer, as it was hopelessly divided, and would not be able to reach a finding of any kind. The record says that they reported they could not agree in a finding. Eastham represents that the grand jury said that they had not as yet agreed as to his case. No other business remained for the grand jury. Taking the judge's answer and the record as true, the discharge of the grand jury was not improper. It is within the discretion of a court to discharge a grand jury. It is a common-law power. Our code recognizes this power in saying that "when one grand jury has been discharged another may, by order of the court, be summoned to attend the same term." Code 1891 s. 10, c. 157. And section 9 says that, when one grand jury has found an indictment not a true bill, another indictment may be sent to it, or acted on by another grand jury, showing that the State may have another grand jury, and persist in her prosecution. Of course, it can do so where there is no finding at all, as here. It is not possible to say that we must minutely inquire whether this discharge was wise, and, if not wise, that it shall vitiate an indictment found by a subsequent grand jury. The defendant cannot take advantage of it, as its discharge released him from peril from that grand jury, unless we assume that it would have found for a low grade of offense,.or none, and then say he had a vested right to have his case passed on finally by that grand jury. We cannot say this. And, if it had returned "Not a true bill," it would be no bar to a second indictment. How can it affect a later indictment? That stands on its own feet, and the discharge of the former grand jury is irrelevant in considering the indictment by a subsequent one; the question then being, is the work of the later grand jury a valid indictment? The court ordered the clerks of the county and circuit courts, on the motion of the State, as authorized by chapter 157, section 1, to draw another grand jury, and on a subsequent day of the term it assembled and found an indictment for murder. *Burton's Case*, 4 Leigh, 647, states the common-law to be that

another grand jury may be ordered upon two occasions. (1) If before the close of the session the grand jury have brought in all their bills and are discharged, and a new offense is committed, or an offender is brought in. (2) "The second ordinary instance of a new grand jury returned is upon the statute 3 Hen. VII. c. 1, namely, a grand inquest to inquire into concealment of another grand inquest, *etc.* 2 Hale, P. C. 154, 156." So says Chit. Cr. Law, 314; Thomp. & M. Jur. § 497. Likely it was thought by the judge that under the principle here stated he was warranted in calling another jury. There was found in the grand jury room, and shown him, a memorandum signed by the clerk of the second jury, reading as follows: "We, the grand jury, find from the evidence before us as follows: That R. W. Eastham made numerous threats against F. E. Thompson. We find that R. W. Eastham assaulted Thompson in the car; one wit. testifying that, to the best of his knowledge and belief, that Eastham fired the 2 first shots. We find that F. E. Thompson died from wounds received in the above encounter." As his reason for ordering a new list of grand jurors to be made up, the judge states that he learned reliably that the county clerk, whose duty it was to draw the grand jury, was openly and avowedly in sympathy with the accused, and that the names in the box from which grand juries were to be drawn, and from which the last one had been drawn, were on slips of paper not folded so as to conceal the names, but open, so that the clerk, if he desired, could select particular ones, and that he (the judge) was reliably informed and believed that such clerk would, if possible, draw an unfair and partial grand jury, and that, as he thought it to be his duty and power, he opened the box in the presence of the prosecuting attorney and clerk of the circuit court, and found said slips of paper unfolded and the names unconcealed, so that any one drawing names could make choice, and therefore he ordered a new list. Section 2, chapter 157, allows the court to open this box, and section 1 allows the court to order a new list. A large discretion is here given the court for the administration of justice. Surely for its mere exercise we cannot review it.

We must now inquire as to the third grand jury, for

here is the kernel of the case. I view all antecedent circumstances as immaterial, as this grand jury and its indictment must stand or fall on their own strength or weakness. These antecedent circumstances as to the two former grand juries may be used as circumstances to sustain the grave charge made against the judge of bias against the accused, to which I will below refer. We have seen that when one grand jury is discharged another may be summoned for the same term. But it is said this was the third at the same term, and that not more than two can sit at the same term. Why not? This ought not to be the law, if it is; for there may occur grave offenses during a long term, and the public and the accused have the right to a speedy trial. It is clear that a criminal court possesses at common law, without statute, inherent power to impanel grand juries, and I know no limit; but I know, on above authority, that it can summon new grand juries at the same term, and this inherent power carries the ability to summon new ones as often as necessity exists. Opinion in *Burton's Case,* 4 Leigh. 648; *Shinn's Case,* 32 Grat. 899. But counsel say that when the Code says that, when one grand jury is discharged, "another" may be summoned for the same term, it means only one other,—a very strict construction, depriving a court of a power given by common law for wise purposes in the speedy administration of justice. It means no such unreasonable thing. It only means to declare, out of great caution, what the common law gave,—a power to have further grand juries. Why so narrowly construe a remedial clause? If it had been intended to change the common-law power, and limit to one grand jury, why did not the lawmaker, if he had in his head that purpose, say so? Mere implication cannot so crop the powers of a court. And just now I notice, what is strongly confimatory of this view, that Code, c. 157, s. 1, provides that "any circuit court may, at a special or adjourned term thereof, whenever it shall be proper to do so, order a grand jury to be drawn and summoned to attend such term." Who is to judge when it is proper to do so,—the judge or prosecuting attorney, or an accused? I say the public functionaries, as grand juries are to subserve public ends. And it may well be that more than two juries are needed

at a regular or adjourned term. This shows, in connection with section 10, saying that when one jury is discharged another may be summoned, a clear intent to have a second jury, or more, either at the regular or adjourned term (that is, two at the adjourned term), and not to count the one at the regular term, and thus disable the court from having two or more at the adjourned or regular term. So it is clear that no law forbids three grand juries at one term.

It is alleged that the list of grand jurors is not mentioned in the record of the county court. There is no denial that the list was in fact made by the county court. It is found in the possession of the lawful custodian, the clerk, as well as ballots made from it. This duty of a county court is merely ministerial, not judicial.

Another objection is that the court illegally excluded certain grand jurors. The court asked the jurors whether they knew the circumstances of the case, or had formed or expressed an opinion about it. The broad position is taken that, when the county court makes its list of persons for grand jury service, it finally settles their qualifications, and the court cannot inquire into their qualifications, to see if they are freeholders, or otherwise qualified, because section 3, chapter 157, Code, says that all grand jurors shall be selected from the list by drawing ballots, and those drawn must serve, qualified or not. If so, one not a freeholder when placed on the list, or becoming such later, must be seated, in the teeth of the act disqualifying him. If he is then deaf or insane, or afterwards becomes so, he must serve, under this doctrine. The law says that the county court shall select freeholders who are "in other respects qualified," and not constables, hotel keepers, surveyors of roads, or owners or occupiers of mills. It can not have been meant that the court, which has the duty of impaneling, is powerless to carry out this legislative intention by inquiring into qualifications. The Michigan act says those drawn "shall be the jury to try the cause" (Comp. Laws 1857, § 4392),—as strong language as our act; yet, held, the court may select others. *Mining Co.* v. *Johnston,* 23 Mich. 37. The old law was that the sheriff should return a list. Did anybody then imagine that the court could not go behind his decision and test their

competency? They always did so. The only difference is that now the county court makes the list, performing a merely ministerial act, not judicial; and this list does not conclusively establish the qualifications of those on it, but merely presents names for lawful selection from them by the court impaneling the jury, according to its functions at the common law. In both cases the lists are only lists. The court can test qualifications: The court in this case put to the jurors fair and impartial questions, as to whether they had heard the facts, or had formed or expressed an opinion as to the case, and excused five, and put others in their places. I do not think this was proper, because our statute allows the unsworn statement of two grand jurors to call for an indictment, and this shows that a bystander fully conversant with facts may be a grand juror. And I do not think the formation or expression of an opinion as to the case calls for exclusion, though Chief Justice Marshall, in the great trial of Aaron Burr, (Fed. Cas. No. 14,692g) for treason, allowed this objection, and other very respectable authorities have allowed it. 3 Rob. Prac. 89. It is fair to say that much authority can be found giving a court, even in felony trials, power to discharge jurors. Thomp. & M. Jur. §§ 258, 259. There it is laid down that, as the selection is for the court to secure fit persons, large discretion is given, and that "it by no means follows that, because certain causes have been declared sufficient to justify the trial court in excusing a juror, the sufficiency of excuses in general must be considered a matter of law. On the contrary, it may be considered as the recognized rule that the discharge of a juror under these circumstances is a matter addressed to the sound discretion of the court, which will not be reviewed in the absence of evidence showing prejudice to the complaining party from the abuse of such discretion." 5 Am. & Eng. Enc. Law, 5. And in section 580, subsec. 1, Thomp. & M. Jur., this doctrine is applied to grand juries. The great law writer, Bishop, says perhaps a greater number of courts have upheld this ground of exclusion, and he only doubts it because of the difficulty of enforcing it where so many cases come before a jury, rather sanctioning the principle of excluding for formed opinions, and treating it as an open question. 1 Bish. Cr. Proc. § 881. But it is treated in argu-

ment in this case as utterly unheard of, and as violating the right of the accused and unprecedented. Complaint is made as if the jury were not fair, and yet an examination calculated to get an unbiased jury, free from formed opinion, is relied upon to overthrow its work. How could those questions hurt the State or the accused? But I do not think it proper to exclude for this cause, as there can be no challenge of grand jurors for favor, though there may be for cause, as not a freeholder. Mere favor will not do. Thomp. & M. Jur. § 574; *State* v. *Hamlin*, 36 Am. Rep. 54; note, *Com.* v. *Green*, (Pa. Sup.) 12 Am. St. Rep. 906 (s. c. 17 Atl. 878); *State* v. *Davis*, 34 Am. Rep. 706; *Com.* v. *Woodward* (Mass.) 34 Am. St. Rep. 302, and note (s. c. 32 N. E. 989). Challenge for favor does not prevail in Virginia. 3 Rob. Prac. 92.

The judge, in his sworn return to the rule, says he had learned that grand jurors had been approached and tampered with by friends of the accused, and he deemed it his duty to put these questions, in the effort to get an impartial grand jury, and thought it proper, under the circumstances. The statute says they shall be freeholders, and "in other respects" qualified; and the court may have thought this course proper, under this language, and no doubt acted in this in good faith. But he enforced a qualification not a qualification. Then what is its effect? Does it nullify the indictment? I think not. There is no claim that those substituted were disqualified. This Court held that if qualified jurors were rejected, and qualified jurors substituted, this would not vitiate a verdict, because, so the case is tried by a fair, qualified jury, that is all the party can ask. I refer to the discussion of this subject in *Thompson* v. *Douglass*, 35 W. Va. 337, 340 (13 S. E. 1015). I now find the position there taken sustained by authorities not there given. Thomp. & M. Jur. § 251, says: "Where a statute simply provides that an exception may be taken for disallowing a challenge, no exception lies for allowing a challenge,"—and says: "The reason is that when a competent jury, composed of the requisite number of persons, has been impaneled the purpose [of the law is accomplished. Neither party can be said to have a vested interest in any juror. Therefore, though one competent person has been rejected, yet, if another equally competent has been

substituted in his stead, no injury has been done." See *Id.* § 259. Judge Christiancy affirmed this doctrine in *Mining Co.* v. *Johnston*, 23 Mich. 37. See (strong instance) *Com.* v. *Livermore*, 4 Gray, 18, where a juror in a criminal case was excused, though qualified, and it was held no error. Judge Hughes, in the United States Circuit Court of Virginia, thought it better to excuse such juror, and held that where a foreman is relieved, and another substituted, it did not affect the indictment. *U. S.* v. *Belvin*, 46 Fed. 381. See (strong case) *State* v. *Hunter*, 43 La. Ann 157 (8 South 624). *State* v. *Schieler* (Idaho) 37 Pac. 272, holds it right to excuse a grand juror informed of facts. I refer specially to a case just met with, and the opinion, holding that a grand juror may be excused by the court on its own motion, if the one substituted be qualified. See the opinion in *U. S.* v. *Jones*, 69 Fed. 973. Yet here, in the case of a mere grand jury, this is claimed to nullify its work. For stronger reason this rule applies to a grand jury, as said in the Vermont case of *State* v. *Ward*, 14 Atl. 187, 194, where it is said that the accused had no vested right to a particular grand juror, and the right to excuse, exercised for good purposes to promote justice, was properly exercised. See that opinion. It is a mere irregularity, or rather error of judgment, in the judge, but the grand jury is none the less one assembled under color of law, by a competent court, and not a body of usurpers, wholly unauthorized. Thomp. & M. Jur. § 140, says: "The grand jury is merely an accusing body, and the liberty of the citizen does not require that nice inquiry should be made into the manner in which it has been organized. The main question is whether the prisoner has been justly accused or not. * * * Such attacks have been successful in American courts with scandalous frequency, and almost universally to the thwarting of public justice and the injury of society. But with reference to the constitution of the body to try the prisoner the question is entirely different." Thompson & Merriam say in section 554: "In view of the fact that the finding of a grand jury is only an accusation, at most, it is not surprising that courts should not be astute in discovering technical irregularities in the process of procuring this jury [grand jury],"—and quotes Justice Swayne as saying in *U. S.* v. *Ambrose*, 3 Fed. 287: "Whatever

occurs in regard to the constitution of a grand jury is really a matter of very little importance to the defendant. It is fairly to be supposed that if one grand jury, made up in good faith, has found an indictment, another, on the same testimony, would find another. So that the only benefit to the defendant, even if that be a beneficial result, would be delay before the trial." Same effect, 9 Am. & Eng. Enc. Law, 3, note. Having said that this mere error of judgment of the judge does not make the grand jury a body of usurpers, void and of no authority, I refer to the dissenting opinions of Judges Beatty and De Haven in the California case of *Bruner* v. *Superior Court*, 28 Pac. 351, 352, and the case of *People* v. *Petrea*, 92 N. Y. 128, where an indictment by a grand jury drawn from a petit jury list under an unconstitutional statute was held valid, and the party tried under it, and it was held no infraction of the right given by the constitution to be first indicted by a grand jury. The court said: "The grand jury, though not selected in pursuance of a valid law, were selected under color of law and semblance of legal authority. The defendant in fact enjoyed all the protection which he would have had if the jurors had been selected and drawn pursuant to the General Statutes. Nothing could be more unsubstantiated than the alleged right asserted by the defendant under the circumstances of this case. * * * An indictment was found by a body drawn, summoned, and sworn as a grand jury, before a competent court, and composed of good and lawful men. This fulfilled the constitutional guaranty. The jury was a *de facto* jury, selected and organized under the forms of law." "Moreover," said the judge, "they were good and lawful men, duly qualified to sit as grand jurors." Mere irregularity in the manner of selecting the grand jury, when objection does not go to the competency of jurors, can not be taken advantage of even on plea in abatement. 1 Whart. Cr. Law, § 472, note, and *State* v. *Ward* (Vt.) 14 Atl. 192.

After the exclusion of five of those summoned, it became necessary to supply them, as the law requires only sixteen to attend a term. It is argued that they must be from the list prepared by the county court. This would require the clerk of the circuit court to summon the clerk of the county court to meet him and make a new list, and they

would have to be summoned by *venire facias*, and the statute provides for this formulary to be done twenty days before a term, at least. Plainly, the statute does not provide for all this in case the sixteen attending are cut down below the lawful jury of fifteen.. Is the court powerless to complete the panel? The common-law, in cases wherein the statute does not provide, would .say to the court to go on by directing the sheriff to summon talesmen forthwith. The dispatch of business requires it. *Com.* v. *Green* (Pa. Sup.) 17 Atl. 978. The very power to impanel a jury carries with it this power. Thomp. & M. Jur. 581; *Burton's Case*, 4 Leigh 645. If there be no common-law power to summon talesmen (I think there is), it is all the more necessary to give this remedial construction to our statute. The argument is that section 3 of chapter 157 says all grand jurors shall be taken from such list, and that not even the language of section 10, that "if the foreman or. any grand juror be unable or fail to attend after being sworn, another may be sworn in his stead," will let the court fill his place except from the county court list. The act does not say so. How inconvenient! The common-law power cannot be taken away by such mere implication. The idea that a court can be thus disarmed of its wonted and necessary powers cannot be sustained. This section does but declare the old inherent common-law power of the court. Again, it is argued that section 10, when it says: "If a sufficient number do not attend, the court shall direct the sheriff to forthwith summon as many others as may be necessary, whether their names are in such list or not, but who shall in other respects be qualified to act as grand jurors,"—not only does not declare the right of the court to summon talesmen to fill the places of those who attend but are rejected, but impliedly prohibits it, as it allows such summoning only to fill vacancies caused by nonattendance. Rigid construction,—very rigid,—paralyzing, almost, the court from going on with its business. I say that that language, fairly construed, plainly intended to provide against failure to complete, for any cause, a jury from those attending, and only declares the common-law, inherent power of the court, possessed by it because it is a criminal court empowered to inquire by its grand jury and try public offenses, to complete its grand jury once begun.

Why say it applies only in one event, nonattendance, when from many causes the sixteen will prove inadequate? The word "forthwith" negatives any idea that you must go through the routine of issuing a new *venire facias*, summoning clerk, and drawing ballots. The statute declares that it makes no difference whether those summoned are on the county court's list or not, overriding the contention that talesmen can only come from it, if it applies to other cases than failure to attend. In 9 Am. & Eng. Enc. Law, 4, we read: "Where a statute provides the manner in which grand jurors shall be selected and drawn, it does not necessarily exclude the common-law method; and, if an exigency arises, a court may direct an open venire for the selection and summoning of a new panel."

Next it is objected that these talesmen were summoned by one not authorized. The sheriff had the court appoint Haller and Lipscomp as special deputies "for the sole purpose of serving the summons on the special grand jury this day drawn"; and it is contended that their authority extended only to those on the list, not to summoning talesmen. This is drawing a very refined point. Those talesmen were a part of that grand jury. If fit to summon those on the list, why not the talesmen? Their power fairly extended to them. I am not sure that a deputy once made is so limited in authority, our statute giving him like power with his principal. It is claimed that his powers had closed, because the sheriff, before he summoned talesmen, told Haller he had no further use for his services. There was no formal act of removal. But is it possible this can destroy totally the legality of the grand jury, and make its work void? To say so would be a travesty on justice, sticking in the bark and forgetting the heart of the tree, making solemn legal proceedings perish for mere technicality. Not a word is said against the jurors this deputy summoned. The court swore them in as grand jurors,—a competent court. They did not leaven the mass, and make the jury a usurpative body. Our statute gives no challenge for such cause,—indeed, for any cause; and Thomp. & M. Jur. § 557, says, as to the objection that a substitutue for a sheriff summoned grand jurors, that "statutory challenges to the panel are generally regarded as exclusive of all others, and therefore, if the

statutes do not afford means of enforcing the right here conceded, by a challenge to panel, this can be done in no other way. And at common-law there seems to be no right to challenge the grand jury panel or jurors." Thomp. & M. Jur. § 507. Section 555 says: "It is not a sufficient ground for a challenge to the array that a jury list was prepared by *de facto* commissioners only." Much less so where a few talesmen are summoned by an agent of the court, almost, if not wholly, in its sight. With great emphasis the counsel of the accused· cite the case of *Bruner* v. *Superior Court*, 28 Pac. 341, holding, under a California statute providing that where sufficient grand jurors are not present the court shall order the sheriff or an elisor to summon others, that grand jurors summoned by an elisor without its appearing that the sheriff was disqualified, were illegal, and made the grand jury and its indictment void, and justified a writ of prohibition because the indictment was void. This decision is illogical in itself, and loses force when we see that, out of seven judges, three entered dissent in very strong opinions, asserting that, though the elisor had no authority, yet the grand jury was not a void body, but assembled under color of law in a regular court, and was recognized as such. And there is no objection to their qualifications, only to the manner of summoning.

It is objected further against this indictment that the grand jury, at a recess for a meal, was put in charge of the sheriff, as if a petit jury, and this is charged to be contrary to law. It is unusual, but is it contrary to law? If a court thinks its grand jury may be exposed to undue influences, I would suppose it might take this precaution. How could it hurt the accused, in a legal point of view? A grand jury must go only on evidence, and no one has a vested right to have it exposed to danger of improper influences, if the judge thinks there is danger of it. He is the public functionary having supervision of it.

It is objected that the counsel for accused asked to see the indictment, but was refused. It was late at night, and the court was to adjourn; and the judge says he thought prudent to take care of the paper, and, instead of allowing the original indictment to go into the hands of the attorneys, at once ordered the clerk to furnish a copy within an

hour, and it was furnished. This was a reasonable provision. The Code (chapter 159, section 1) does not give an accused or his counsel the original indictment, but a copy. I fail to see the effect of this to invalidate the indictment.

Another point made by the accused is that the record of proceedings in the case as made in the order book is false, as regards the report made on the case by the second grand jury, and in stating that the talesmen were summoned by the sheriff, whereas they were summoned by Haller, under circumstances above given, and that the judge refused to correct the record. It is clear that we must follow the court record as made by the constituted authority. The judge, however, admits in his answer that Haller summoned the talesmen; and I have treated that as a fact, and considered the question, though, perhaps, as contradicting the record, it might be disregarded, as inadmissible.

Another point is that the judge refused to sign bills of exception setting out the challenge to the array, the exclusion of persons from the grand jury, the facts touching Haller's acting as deputy sheriff, and exception to charges given the grand jury. Bills were prepared, placed in the judge's hands to consider and before coming into court afterwards he was served with the rule in this case, and announced that for that reason he would not sign them, as it would be in contempt of this Court, and would not alter said order book for a similar reason. I am clear in my own mind that the rule did not prohibit the circuit court from manifesting by its order book and bills of exception its past action, but only further steps of prosecution, and yet I cannot say that one might not think, with some plausibility, that it stopped at once all proceedings whatever. Would it be an abuse of power to think so? But prohibition does not lie for this. A *mandamus* to compel the signing is the proper remedy. The judge says he is willing and ready to sign when the prohibition ends, thus showing that he does not propose to abuse his power in this matter, so that prohibition, if it would lie, is not necessary on this score. He did sign a bill as to ordering a new grand jury.

It is urged that the court charged the grand juries erroneously. I shall not at this point refer to a charge to the

second grand jury, as it is immaterial under this head. The accused asked the court to say to the grand jury which found the indictment that it had the right to call for any witnesses, if its members believed they could give testimony bearing on the case. The grand jury is a one-sided proceeding, and before it the accused has no right to appear or to send witnesses. It is only a means adopted by the state for inquiring whether its criminal law has been violated, and to present its accusations for jury trial. By no means does it hear the whole case. It is only the state bringing a prosecution. The state presents to it its indictment, and the grand jury has only to say whether, upon the state's showing, the accusation is well made, or proper to be tried by a jury. It is true the jury is sworn to present the truth, the whole truth, and nothing but the truth; but the connection of that clause with its neighbor words in the oath shows that it is to prohibit them from the influence of malice, hatred, ill will, fear, favor, partiality, or affection; and it certainly means no more than that they shall present the whole truth, and nothing but the truth, as shown by the evidence presented by the state. They find on it. They do not go into a search for evidence to exculpate the defendant. Once lay down the rule otherwise, and the defendant, by some friend on the jury, will call up controversy, and virtually try both sides in the grand jury room, where the state can not be present by her attorney to sustain her charge by a full presentation of the law, and an inadequate investigation into her charge will take place, and prosecution for the gravest crime will be smothered and crime fostered. I know that it will be said the defendant may under this rule be the victim of false or mistaken prosecution. True, but that is inevitable in instances. If the oaths and other safeguards of the grand jury do not furnish adequate security against that misfortune, I can only say the wit of man has yet devised no better. His vindication comes before the petit jury. I know that some authority to the contrary can be shown, but I answer that the vast volume of ancient and modern authority sustains this view. This has been recognized in some states, as in New York, by statutes allowing the grand jury to send for witnesses, showing that it required legislation to admit such evidence.

Fault is found in the charge of the judge to the grand jury, in that there would be evidence before it of the killing of a citizen of Tucker County, and "should the evidence be sufficient to make a *prima facie* case of willful, deliberate, and premeditated killing (what I mean by that is, should it be sufficient of itself to show such killing, without explanation by the accused), then you should find an indictment for murder," and stated that upon such indictment on trial the defendant could plead any legal defense. I see no error in this,—nothing that is not warranted by the usual practice. Is the complaint that this constructively tells the jury that all homicide is *prima facie* murder, and ought to be so indicted? This is true. It is the usual and proper course, and one advised by the courts in their charges, that it is proper in such case to find an indictment for murder, so that the state and accused can get their respective rights in a high or low grade of crime, according to the evidence. The judge did not tell this jury it could find an indictment for manslaughter, as clearly it could, under chapter 144, Code. But who will say it is error to omit it from a charge? But what if a judge does err in a charge to a grand jury? The defendant can take no exception to affect the indictment. He can not ask any particular charge. Thomp. & M. Jur. § 600. When once the indictment has been retured "A true bill," it is immaterial whether the court erred in charging or omitting to charge, as the question then is to try the case, and learn whether the accused is guilty. Failure to charge, though statute requires it, will not affect indictment. *Porterfield* v. *Com.* (Va.; 1895) 22 S. E. 352.

I come now to the charge of prejudice and bias on the part of the judge against the accused. This charge can not be made upon even a final trial before a jury. Were this tolerated, any one under charge of crime could shear courts of their powers, drive judges from the bench, and greatly impede the administration of justice. Whart. Crim. Pl. & Proc. § 605; *People* v. *Williams*, 24 Cal. 31. Prejudice in the breast of a judge, a lawgiver in Israel, is odious under sacred and profane law, is easily and readily imputed by persons in the heat of controversy, and, under the sting of adverse decisions, is difficult to clearly disprove, and should never be found except upon the most cogent

proof. From the many circumstances in this great and important case, on which is predicated this grave charge, I am unable to verify it. If there is other explanation, we must give it. I do not think circumstances above given will sustain it. Nor do I find others. It is true that when the second grand jury failed to find anything the judge did use language to it which, as he was going to discharge it, was uncalled for and useless; that is, that the court had concluded to discharge it; that, notwithstanding the court had indicated to the jury its duties, some had persistently refused to perform them, notwithstanding it was their duty to report and return indictments to the court; and that the court had no further use for them. I have heard very reputable judges so animadvert upon grand juries. But does this show wrongful bias against the accused? It may be further said fairly, from the face of the case, that the judge thought there ought to be an indictment and trial of the facts of the case before a jury of the country, and that the indictment should be for murder, so as to let a jury pass on the true grade of the offense, if the accused was guilty. I do not see that there is anything unreasonable in this on the part of a public functionary charged in large measure with the administration of criminal law. Does it show that he enforced this indictment unduly? That it is not the free act of a grand jury? Does it show corrupt prejudice against the accused that will overthrow the indictment? We are not on the subject of final trial. Throughout the proceeding every step of the court in forming and charging the juries, ordering a new list, summoning talesmen, and in other regards, was excepted to by counsel for the accused; and there unfortunately arose much feeling between court and counsel, and heated controversy and oral altercation, but that was between court an counsel. Does it show corrupt prejudice by the judge against the accused, that led the judge to enforce, and that did enforce, this indictment? That is the point. Can all this invalidate a solemn finding of a true bill by the grand jury, and justify this Court in excusing the accused from answering before a jury whether it is a true bill? Does the mere discharge of the second jury work such a result? Does the impaneling another jury on the demand of the State's attorney, who stated that he wanted another jury

specially to inquire into this transaction, show this? Could the judge refuse such a demand? After the court's order for another grand jury, it announced to counsel that it had up to that time allowed them to discuss questions they had raised touching instructions to the grand jury and other matters, not because they had the right, or that Eastham had any standing in court until indicted, but out of courtesy, but that they would not be allowed to discuss any question relating to the summoning, impaneling, or organization of the next grand jury, or charges to it, but would be allowed exceptions to the action of the court, without hearing. This is relied on in the petition. What is wrong in this? Discussion of the subjects specified by the court had been had. A court has a right to limit discussion. There is no right to discuss the formation, summoning, or charging a grand jury. That belongs to the court, and is a matter largely of discretion. Thomp. & M. Jur. § 578. I doubt whether these matters can be made the subject of exception. I do not think they can. So far as available, it is by plea in abatement, not for exception and discussion pending the formation of the panel. In my experience I have never known it practiced. If allowed, where would it end? Is there even a right to a challenge to the panel or the polls of a grand jury unless statute gives it? Thomp. & M. Jur. § 507, says not. 1 Bish. Cr. Proc. § 876, says it does not prevail in all states. I can find no instance in Virginia. Our statute does not give it.

It is stated in the petition that when the indictment for involuntary manslaughter was dismissed the court refused to discharge the accused. The State's attorney resisted discharge, asking another grand jury. 1 Bish. Cr. Proc. § 870*a*, says that, when a grand jury has ignored an indictment, one in jail is generally entitled to discharge, but that, of course, he may be detained on an amended accusation; "and, indeed, the court may continue the case for examination at a future term, or otherwise decline the discharge, if the witness have not appeared, or the grand jury has not acted on the case." Though a misdemeanor indictment was found, yet the State not wishing to prosecute it, and asking another hearing before a grand jury, I understand it to be in the power of the court, and common practice, to

hold the prisoner at the State's motion. Our Code, in section 12, c. 158, discharges a prisoner if not indicted before the end of the second term, plainly allowing the State till then to hold the prisoner upon her charge. Though an indictment for a minor grade of offense, or a faulty indictment, be found, which the State refuses to prosecute, it is equivalent to the case of no indictment found, and under the plain intent of the statute the State is allowed to detain the defendant under the mittimus issued by the justice until the end of the second term. So I do not see that the court either exceeded its power, or erred in this matter.

Clearly, as to refusal to bail, there was no abuse of power, as that is in the undeniable discretion of the court. Of course, refusal to discharge or bail could not vitiate the subsequent indictment.

So I conclude that there is no ground for holding this indictment either absolutely void, so as to warrant prohibition, or voidable, so as to overthrow it on plea in abatement. . There is no strength in petitioner's present case. The matters he complains of as irregularities affect none of his substantial rights, and are merely technical. Of course, prohibition does not lie on the theory of want of jurisdiction in the circuit court to impanel a grand jury and try a case of murder; and therefore the only theory on which to rest it is that the court, because of some of its actions, abused its lawful jurisdiction, in exceeding its' powers. What do we mean by the declaration that prohibition lies when a court in the exercise of a conceded jurisdiction abuses its powers? I answer that it is where the court on its way in the case does some collateral act which under no circumstances, on any state of facts, it could do in the case. If it be a mere mis-step, an error of judgment, in the regular disposition of the case, I say in · the line of the case, writ of error, not prohibition, lies, as perhaps where a justice holds plea of a money demand over three hundred dollars, or as in *McConiha* v. *Guthrie*, 21 W. Va. 134, where a court, though it had jurisdiction to condemn land for public use was proceeding to condemn land within twenty feet of a dwelling, because that was prohibited by law,—under no circumstances could be done. That case I have always doubted, as there was jurisdiction, and the

error was correctible by writ of *certiorari*. So where a unit cause of action is split into several. There is no other remedy against a plain abuse. This qualification to the rule against prohibition where the court has jurisdiction, namely, that it lies where there is an abuse of power, is shadowy and ill defined. Unless limited as I state, it will bring many cases into prohibition not properly belonging to it, and stop the wheels of other usual proceedings before courts have had time to even determine upon their own jurisdiction; prohibition will supplant the ordinary procedure, as JUDGE GREEN said in *Jelly* v. *Dils*, 27 W. Va. 272. Why not let a court go on to the end of a case, when perhaps neither writ of error nor prohibition will be called for? But it is said our statute has enlarged the scope of prohibition by giving it as of right "in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject-matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." I do not think this carries the writ further than its common-law function. *Bullard* v. *Thorpe* (Va.) 30 Atl. 36. Thus none of the acts of the court complained of as an abuse of power are acts of such abuse as to warrant a writ of prohibition. They are not of that character, but, if wrong, are remediable on writ of error, should it ever come to that point. But suppose them to be such acts as are an abuse of power. What then? Prohibition does not still lie, for the simple reason that, if the actions of the court that are complained of have any effect to impair the indictment, they are to be availed of by plea in abatement. In Virginia want of qualification or other objections to a grand jury are to be made effective by that plea, and writ of error in case of adverse decision on it. *Cherry's Case*, 2 Va. Cas. 20; *Long's Case*, Id. 318; *Moore's Case*, 9 Leigh, 639; *Kerby's Case*, 7 Leigh. 747. *McConiha* v. *Guthrie, supra,* decided since chapter 110, Code 1891, pointedly says that, even if there be an abuse of power, prohibition does not lie, if writ of error will cure the grievance. See *Walcott* v. *Wells* (Nev.) 24 Pac. 367. Look at our case of *Buskirk* v. *Judge*, 7 W. Va. 91, holding that, when the law indispensably required an examination of one charged with felony by a county court before indictment and trial in a circuit court, prohibition would not lie to stop a circuit

court trying him before examination. A much stronger case for prohibition than this. Prohibition is utterly untenable in this case.

One of counsel for the State makes, with confidence, the point that the rule for a writ of prohibition, having been issued by one of the judges of this court in vacation, was without jurisdiction in him to award it, as the Constitution gives original jurisdiction in prohibition to this Court, to be exercised only in term, and not by a judge alone. It is at once seen that this presents the question whether the last clause of section 1, chapter 110, Code 1891, allowing a judge to award a rule in vacation, is constitutional. This is a matter of gravity, and merits serious consideration; but as the rule is that, if the case can be disposed of on other grounds, a court will not pass on the validity of an act of the legislature, I will not further refer to it.

This holding only calls upon the petitioner to answer before an impartial jury of his country whether his act of slaying Thompson is a crime against the laws of his country; only demands what the law demands of all men charged with crime, that he pass what he ought to have, and unquestionably will have,—a fair, just, and impartial trial.

JUDGE McWHORTER concurs in this opinion. The Court being equally divided, the motion to dismiss fails; but then comes the application of Eastham for a writ of prohibition,—his petition and rule being, *per se*, a standing, affirmative motion. It fails, as the Court can take no affirmative action, issue no process to stay the court below, without a majority for it. This is another notable instance of the evil of the Court's being composed of an even number of judges.

NOTE BY BRANNON, JUDGE.

When I wrote the above opinion at Charles Town, I was interrupted daily by arguments of counsel and did not have access to authority. The importance of the case and the division of the Court seem to justify the addition of this note.

As to the point that the indictment is void because the court excused grand jurors because they had formed or expressed an opinion, what I said above I find justified by further examination of authority. Whar. Cr. Pl. & Prac., sec. 346, says:

"It is a good cause of challenge to a grand juror that he has formed or expressed an opinion as to the guilt of a party whose case will probably be presented to the Grand Inquest."

In the Pa. case of *Commonwealth* v, *Clark*, 2 Brown, 325, on full argument and consideration of Chief Justice Marshall's rule in the great Burr treason trial, a defendant was allowed a challenge, after jury was sworn, for favor in that he had expressed an opinion of the prisoner's guilt. In *State* v. *Bradford*, 57, N. H. 198, it was held that the court may excuse grand jurors for reasons appearing to it satisfactory, and the exercise of its discretion will not be reviewed. In *U. S.* v. *Gale*, 109, Justice Bradley said, as I stated above, that there was a distinction between the allowance of qualified and disqualified jurors, adding that "Disqualified jurors upon the panel may be supposed injuriously to affect the whole panel; but if the individuals forming it are unobjectionable and have all the necessary qualifications, it is of less moment to the accused what persons may have been set aside or excused. The present case is of the latter kind. No complaint is made that any of the grand jurors who found indictment were disqualified to serve, or were in any respect improper persons. It is only complained that the court excluded some persons for improper causes because they labored under the disqualification created by the 820th section of the revised statutes, which is alleged to be unconstitutional. It is not complained that the jury actually impanelled was not a good one, but that other persons equally good had a right to be placed on it."

As bearing on the contention that the excusing of jurors vitiates the indictment, and also the claim that the action of the county court in making a list for grand jury service is final, and that the circuit court can for no cause inquire into qualifications, I cite *People* v. *Leonard*, 106 Cal. 302, holding that the court may go into qualifications of those drawn as grand jurors, excuse some and summon others from by-standers, and that list is not final. I quote from the case of *U. S.* v. *Jones.* 69 Fed. R. 976: "The real contention of the defendant is, that the court had no power to excuse any grand juror for any cause whatever, unless he came within the disqualification or exemption mentioned in the statute * * * * In other words, the court had no authority to excuse any juror of its own motion unless he was a minor, alien, an insane person or prosecutor * * * and that the statute furnished the only guide for the action of the court. If the first position of the contention is correct, then it would follow that if the accused whose cause was to come before the grand jury had been on the list drawn from the jury box, the court would have been compelled to accept him as a grand juror, and to have allowed him to act in all cases except his own. If twelve of the grand jurors had testified that they had formed and expressed opinions that the defendant was guilty, and that they should vote in favor of indictment without further evidence, the court would have no power to excuse them, or either of them. If it was brought to the attention of the court, in a reliable manner, that one or more of the jurors had offered in advance of being sworn, to sell his vote for any sum of money to either party, the court would have

no power to excuse the juror. These illustrations are sufficient to show the absurdity of the defendant's contention. Such results would be utterly subversive of every principle of justice; would be contrary to the spirit and genius of free institutions; would be a reproach to any court that would permit such a practice to be pursued, and a dark blot upon the jurisprudence of any country. There is no law that gives an accused person the absolute right to have grand jurors accepted by the court who have formed and expressed unqualified opinion that he is innocent. There is no law, rule or practice that compels the court to accept any grand juror to be on the panel who has formed and expressed an opinion that the accused is guilty." *People* v. *Durrant*, 116 Cal. 179.

It will not do to say that only the defendant can except to bias in grand jurors. The opinion just quoted repels that. One biased in favor of the accused is just as objectionable as one biased against him. I met with a case where one who was surety on the prisoner's bail-bond, was held properly rejected, but the particular case has slipped me. There are so many authorities which sustain the action of courts in excusing jurors because they had expressed or formed opinions, that they shake my mind as to the position I took in the above opinion that the court has no authority to inquire of jurors as to the formation or expression of an opinion. On second thought, the mere fact that our statute allows an indictment to be found upon the unsworn statement of two members of the grand jury does not show that it is wrong to interrogate them as to fixed opinions, because that only means that the grand jury may act on the statement of facts by two of the grand jurors, not on their mere opinions, and mere knowledge of fact is different from fixedness or prejudice of opinion. However that be in West Virginia, it certainly can be said that the action of the court was not an un-heared-of proceeding and does not nullify the indictment. Our Code on page 157, section 12, says that no indictment shall be abated because of the incompetency or disqualification of any grand juror, yet this Court is asked to hold that the presence of those jurors who took the place of the ones accused, though qualified in every respect, shall abate this indictment.

Now, as to the point that the talesmen were summoned by an unauthorized deputy, and were no grand jurors: In *Commonwealth* v. *Brown*, 147 Mass. 585, it was held that a person sworn as a grand juror, whose name had been placed in the jury box, and drawn by the selectmen in respone to venire, though previously the town had ordered it to be stricken from the list, in the absence of his personal disqualification, would not affect the validity of the indictment. Here was one acting who was not a grand juror, but his name had been by accident left in the box after it was stricken from the list. The court said: "It has often been held in other jurisdictions that indictments by a grand jury upon which a disqualified person is sitting, is void. The disqualified

person may have been one of only twelve who voted for the indictment. 2 Hawk. P. C. chap. 25, sec. 28; *U. S.* v. *Hammond*, 2, Woods C. Ct. 197; *State* v. *Symonds*, 36 Maine, 128; *Doyle* v. *State*, 17 Ohio, 222; *State* v. *Cole*, 17 Wis. 674; *McQuillan* v. *State*, 8 Smedes & M. 587.

"How such an indictment should be regarded is a question we need not decide, for distinction must be drawn between a juror who is personally disqualified, and one who possesses all the qualifications but is irregularly and improperly drawn. The general rule is that mere irregularity in the proceedings, by which a juror gets upon a panel, does not affect the validity of his action. *Commonwealth* v. *Parker*, 2 Pick. 550, 559; *Page* v. *Danvers*, 7 Met. 326; *U. S.* v. *Reeves*, 3 Words. 199; *U. S.* v. *Ambrose*, 3 Fed. Rep. 283; *Hill* v. *Yates*, 12 East, 229, 230; *The King* v. *Hunt*, 4 B. & Auld. 433; *Hardin* v. *State*, 22 Ind. 347."

DENT, JUDGE (*dissenting*):

Robert W. Eastham, petitioner, being in custody of the sheriff of Tucker County on accusation of the felonious killing of one Frank E. Thompson, the grand jury, at the June term of the circuit court of said county, after investigating the charge, returned an indictment for manslaughter. The prosecuting attorney, being of the opinion that the prisoner should be indicted for a higher offense, with consent of the presiding judge, entered a *nolle prosequi*. The prisoner thereupon moved his discharge or admission to bail. Both motions were over-ruled. The judge directed the drawing and summoning of another grand jury for the purpose of considering the matter at an adjourned day of the term. This grand jury being duly summoned and impaneled, the judge charged them at some length to the effect that, if a homicide was shown, the jury should return an indictment for murder, and leave the degree of the offense committed to be determined by the petit jury, contrary to section 1, chapter 144, Code. Homicide was admitted, but claimed to have been justifiable. Before the jury had reached a conclusion, and while halting between two opinions undoubtedly occasioned by the erroneous charge of the judge, he, instead of correcting his error, unceremoniously discharged them as a disagreeing jury. He immediately ordered a third grand jury to be drawn, and summoned to a future day of the term, and one Haller—not a regular deputy—was appointed at his instance to assist in summoning the same.

On the return day fifteen of the grand jurors appeared, and the judge proceeded to examine them on their *voir dire*, and accepted such as were satisfactory, and rejected such others, five in number, though legally qualified grand jurors, who, for some reason not disclosed by the record, and known only to the judge, were not satisfactory to him. He then caused an order to be entered directing the sheriff to summon six others not drawn from the jury box, and yet, as shown by his answer, he did not permit the sheriff or one of his deputies to execute this order, but orally commissioned said Haller to execute the same. The jurors summoned were. acceptable. Having had them duly sworn, he then proceeded to deliver a lengthy, argumentative charge, which was to the effect that, if a homicide was established by the evidence produced before them by the State, it was their duty, without calling for other witnesses or further investigation, to return an indictment for murder, and allow the petit jury to determine the degree of the offense committed. He then placed the alleged grand jury in charge of the sheriff, and would not permit them to separate or communicate with any one until they returned an indictment for murder, and received the thanks of the judge and their discharge. The judge admits the truth of this statement, in substance, as set forth, but justifies his course on the ground that it was necessary to obtain an impartial grand jury and prevent it from being · unduly influenced by outside pressure. It is manifest from this that an impartial grand jury meant one that would find an indictment for murder, in accordance with the evident desire of the judge, as shown by his several instructions to the successive grand juries. That the judge, either through lack of experience or unusual zeal, was led to commit numerous errors, harmless or prejudicial, cannot be denied; nor is it our place to ascertain whether they were justifiable, under the present application.

The contention of the respondent that the clause of section 1, chapter 110, Code, is unconstitutional, in so far as it authorizes a rule to show cause to be issued by a judge of this Court in vacation, is wholly untenable. The legislature is invested with the power to regulate the practice in courts of justice, and has authority to prescribe in what manner proceedings in prohibition shall be instituted. It

might provide that it be done by notice, or by summons issued by the clerk, or by rule. There is nothing in the Constitution that prevents the legislature from imposing on the members of this Court the duty of examining the petion and awarding the rule. In furtherance of the jurisdiction of this Court during its vacation the power had to be lodged somewhere; otherwise the act sought to be prohibited might be accomplished before the court could be convened, and the writ would be too late to be effective. Following the analogy of appeals, the legislature imposed the duty on a single judge until the court should meet in term, when the object of the rule ceases, and the matter is wholly in the power of the court to abate it, renew it if faulty, or award the prohibition. Section 6, Art. VIII, Const., does not militate against this conclusion, for that is not a grant of, but a restriction on, the authority of the court or a judge thereof to grant appeals, and is to this extent a limitation on the power of the legislature to regulate the practice in such cases. The awarding of a temporary rule in prohibition being a matter that affects the remedy, but in no wise determines the rights of the parties, the legislature has absolute control thereof. The real question presented at this time for our consideration is as to whether the judge was guilty of such usurpation or abuse of power as renders the indictment void, and therefore no indictment, but a nullity. If, in the commission of the various errors complained of, he did not exceed his jurisdiction or legitimate powers, prohibition will not lie; otherwise it is the mandatory remedy. Nor is the question of adequacy or inadequacy of remedy involved, as section 1, chapter 110, Code, makes it imperative, as a matter of right, in all cases of usurpation of jurisdiction or excess of legitimate powers, notwithstanding the existence of other remedies. The statute, in derogation of the common-law, determines, without the aid of judicial interpretation, that in such cases no other remedy, however efficient, is adequate. It has thus taken prohibition out of the extraordinary, and made it the ordinary and proper remedy to restrain all inferior tribunals within the scope of their legitimate powers. Rightly so, for it affords speedy justice, without sale, denial, or delay, and promptly prevents the abusive, oppressive, or tyrannous use of judicial power in

response to partisan passion or private malice. Nor does the statute permit a court, under the pretext of determining its own jurisdiction, either to usurp powers that do not, or refuse powers that do, belong to it. *Railway Co.* v. *Paull*, 39 W. Va. 142 (19 S. E. 551). In such cases the court must always decide right, for it would be monstrous to refuse to allow the most ignorant criminal to plead ignorance of law, and yet accord a high judicial functionary, presumed to be learned in the law, such privilege, in justification of his assumption of illegal powers or authority. The statute countenances no such plea or excuse, and for us to entertain it is to so amend the statute as to make it read, "The writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power when the inferior court has not jurisdiction of the subject-matter in controversy, or, having jurisdiction, exceeds its legitimate powers," except if, through ignorance of law, and through a desire to promote the supposed ends of justice, the inferior tribunal shall decide it has jurisdiction, or is not exceeding its legitimate powers, then prohibition shall not lie, but only the usual ancient remedies. Such an amendment would render the statute nugatory, and the writ of prohibition anomalous. An inferior tribunal could always justify usurpation and abuse of power through ignorance of law and good motives. It is the duty of this Court to obey, uphold and enforce all legislative enactments within Constitutional limitations, and not, under the pretense of construing such enactments, to usurp for itself or inferior tribunals jurisdiction and powers denied by the constitution and statute, to the impairment and denial of the personal immunities and rights of citizenship. To do so is not to adjudicate, but to legislate. Judicial legislation is entirely too common, and is a very unwise, dangerous, and unnecessary experiment, to say the least. Instead of being excused or justified, it should be severely discountenanced. The plain letter of the statute, without regard to former decisions and precedents, has narrowed the inquiry in this and all similar cases to the mere question of usurpation or abuse of power.

Section 4, Art. III., of the Constitution, provides that "no person shall be held to answer for treason, felony or other crime not cognizable by a justice unless on present-

ment or indictment of a grand jury." Section 39, Art. VI., provides, "The legislature shall not pass local or special laws in any of the following cases, that is to say for  *  *  * regulating the practice in courts of justice, summoning or impaneling grand or petit juries.  *  *  * The legislature shall provide by general laws for the fore-going and all other cases for which provision can be made." By these two provisions, in so far as the subject-matter thereof is concerned, the common-law power of the courts as well as the legislature is restricted or entirely taken away. The grand jury referred to in the first provision is a grand jury summoned and impaneled according to the second. There is and can be no other grand jury recognized by the Constitution or statute law. Such a thing as a *de facto* grand jury, not *de jure*, can have no existence. Both must co-exist to make a legal grand jury, and there can be no other except by usurpation. It is made obligatory on the legislature to provide by general law for the summoning and impaneling of all grand juries, and it is made equally obligatory on the courts to conform strictly to the law so enacted; and it is the assured right of every citizen to require both so to do when his life, liberty, or property is at stake. When a circuit court judge proceeds by illegal methods, though his motives be ever so pure, to obtain indictment against a citizen of the state, he is guilty of usurpation of power in excess of his legitimate jurisdiction as limited and restricted by the provisions aforesaid, to the destruction of such citizen's rights thereby guarantied. "The grand jury must be selected in the manner prescribed by law. There is no security to the citizen but in a rigid adherence to the legislative will as expressed in the statutes for our general guidance." *Brown* v. *State*, 9 Neb. 163, (2 N. W. 380). These constitutional restrictions on the common-law powers of the courts are founded on justice, sustained by reason and experience. The English people were first compelled to adopt them to curb the oppressive conduct of the crown, exercised through its corrupt and corruptible judiciary. They were early added by way of amendment to the Constitution of the United States, and at the formation of this State were made, and have been continued as, a part of the Constitution. Prior to the separation or division they were not a

part of the Constitution of Virginia. Hence the decisions relied on to sustain the common-law powers of the judge are not applicable, but are obsolete. Formerly a grand jury was considered merely an accusing body, with which those charged with crime had nothing to do. Under our constitutions, state and national, a grand jury is recognized to be a necessary protection to the citizen against unfounded accusation or unjust prosecution, whether it emanates from "the government, or is prompted by partisan passion or private enmity." *Ex parte Bain*, 121 U. S. 1 (7 Sup. Ct. 781). And a grand jury under the law as it now exists is defined to be a judicial court of inquiry, summoned and impaneled strictly in accordance with the provisions of the general law enacted for the purpose by the legislature; and any other body of men, however well qualified individually, would be neither a *de facto* or a *de jure* grand jury, or entitled to perform the functions thereof. The following decisions fully sustain this proposition, and place it beyond controversy; *Ex parte Bain, supra; Finley* v. *State*, 61 Ala. 201; *Weston* v. *State*, 63 Ala. 155; *O'Brien* v. *State* (Ala.) 8 South 559; *People* v. *Thurston*, 5 Cal. 69; *People* v. *Coffman*, 24 Cal. 234; *Levy* v. *Wilson*, 69 Cal. 105 (10 Pac. 272); *Bruner* v. *Superior, Court*, 28 Pac. 341 (92 Cal. 239); *State* v. *Bowman* (Iowa), 34 N. W. 767; *State* v. *Clough*, 49 Me. 573; *State* v. *Symonds*, 36 Me. 128; *State* v. *Lightbody*, 38 Me. 200; *State* v. *Fleming*, 22 Am. Rep. 552; *Clare* v. *State*, 30 Md. 176; *Avirett* v. *State*, 76 Md. 510 (25 Atl. 676, 987); *Stokes* v. *State*, 24 Miss. 623; *State* v. *McNamara*, 3 Nev. 75; *Brown* v. *State*, 9 Neb. 163 (2 N. W. 378); *State* v. *Barker* (N. C.), 12 S. E. 115; *Boyd* v. *State*, (Ala.) 13 South 14; *Roe* v. *State* (Ala.) 2 South. 459; *Brannean* v. *People*, 3 Utah 488; *Doyle* v. *State*, 17 Ohio 224; *State* v. *Easter*, 30 Ohio St. 542; *Portis* v. *State*, 23 Miss. 578; *Box* v. *State*, 34 Miss. 614; *Baker* v. *State*, 23 Miss. 243; *Miller* v. *State*, 33 Miss. 356; *Kohlheimer* v. *State*, 39 Miss. 548; *Thompson* v. *State*, 9 Ga. 210. To these many others could be added.

As opposed to these numerous authorities, my worthy associates rely on *People* v. *Petrea*, 92 N. Y. 128, as in some degree supporting the untenable position taken by them in this case. The premises on which the cited case is founded are illogical, and hence misleading. The general

law of New York required separate lists and separate
boxes for the grand and petit juries. The legislature en-
acted a local law for the city of Albany, doing away with
separate lists and boxes, and authorizing the selection of
grand juries from the petit-jury list. . The court held this
law to be unconstitutional, as local legislation, but held
that a grand jury selected thereunder was a constitutional
grand jury, because "selected under color of law and sem-
blance of legal authority." Had this grand jury been se-
lected under the general law from the petit-jury list, it
would certainly have been held to be illegal; but the fact
that the legislature had authorized it by an illegal enact-
ment is deemed sufficient to render it legal, although for-
bidden by the general law then in force. That is to say,
two wrongs make a right, two negatives make a positive,
two noes make a yes. An unconstitutional enactment can
give color of law and semblance of legal authority to judi-
cial procedure otherwise illegal, as death can give color to,
and is the semblance of, life. The court takes special
pains to limit its decision to the point presented, for the
reason that the prisoner's rights were not in any manner
interfered with, overlooking the fact that it was settling
law, not for the prisoner alone, but for all the citizens of
the State, and furnishing a precedent by which the rights
of the citizens of all other states might be put in jeopardy.
The Constitution guarantees to every person charged with
an offense, however guilty, the absolute right to be indicted,
tried, and convicted strictly in accordance with law; and
this right ought not to be gradually construed and adjudica
ted away by a play on the words "*de facto,*" "*de jure,*" "col-
or of legal authority and semblance of law." If constitu-
tional guarantees can be frittered away in this manner by the
courts, the public will soon learn to construe an angry mob
to be a sufficient *de facto* grand and petit jury, and a rope
in the hands of lawlessness to be sufficient "color of legal
authority and semblance of law," because, forsooth, the
victim is guilty, and thereby outlawed. It is contrary to
public policy, and highly subversive of governmental in-
tegrity, to uphold as valid and legal acts done violative of
individual rights in obedience to an invalid enactment of
the legislature, contrary to the provision of a valid enact-
ment then in full force and vigor. Such is not the law of this

State, but all acts done derogatory to personal rights in obediance to an unconstitutional enactment are utterly null and void, and the only saving with regard thereto is that no officer shall be held civilly or criminally liable for the lawful exercise or discharge of his duty under an act of the legislature afterwards adjudged to be unconstitutional. Code, c. 147, s. 18. The respondent in the case under consideration admits that he purposely and materially departed from the method provided by the legislature for the selection of grand juries. Justification of his course is sought under his common-law powers. These, as heretofore shown, are clearly abrogated by the constitution and statute enacted as a substitute therefor. But to be more explicit, even to needless repetition, section 10, c. 157, Code, which authorizes the summoning of another grand jury when one has been duly discharged, in case an unforeseen exigency therefor should arise, does not authorize the discharge of one grand jury because it refuses to be governed by the illegal instructions of the judge, and the summoning of another who will quietly submit to such instructions. The right to discharge one for such cause, and summon another in place thereof, necessarily includes the right to discharge and summon successive grand juries, many in number, until one be obtained subservient to the wishes of the judge. An indictment thus begotten is a legal abortion, which should perish in the sin of travail. Such was not the intention of the legislature, and such abuse of power should not be tolerated. *O'Brien* v. *State, supra.*

It was judicial usurpation or abuse of power to place the grand jury in custody of the sheriff. The grand jury is designed to be an independent court of inquiry, selected from among the best citizens of the county; and while nominally under charge of the court, as a constitutional adjunct thereof, the jurors are entitled to the same freedom of person, and to be regarded as of equal integrity and as free from bias and undue influence, as the judge himself. And they would have the same right to suspect and charge undue influence against him as he against them. Sixteen men are no more liable to disregard their solemn oaths, through prejudice, bias, partiality, or undue influence, than one. They are as sixteen to one. The stand-

ard by which we should measure other men of equal standing and credibility is our own integrity. Our minds should furnish the true guage of honesty. A petit jury is usually detained in custody for the protection of the prisoner, and he alone can complain of its separation. This grand jury is claimed to have been kept in custody to protect it from the prisoner or his counsel, officers of the court. If such was the only purpose, the error might be overlooked as harmless, though the excuse is not a legal justification. If, on the other hand, it was a show of authcrity, for the purposes of coercion and intimidation under illegal instructions and illegally limited evidence, to obtain the character of indictment sought, any action resulting therefrom would undoubtedly be illegal and void. Such excessive power, though honest in purpose, should be denied because in unscrupulous hands it might be used to further dishonest ends. To keep the fountain of justice pure and above reproach, the very appearance of evil should be avoided. This Court might as well be placed in custody of a sheriff, as a grand jury; for, within their respective spheres, they are equally independent and co-ordinate members of the same judicial system. When the noble independency of the grand jury is destroyed the efficiency of our judicial system goes with it, and "a government of the people, by the people, for the people," is placed in jeopardy and doubt. Our government rests, in theory and practice, wholly on the American integrity of its citizens; and if the noblest of these cannot be trusted to faithfully discharge the duties of grand jurors without being restrained, in imitation of star-chamber methods, of their freedom, as suspicious culprits, the foundation on which our free institutions rest are but the shifting sands of the seashore, and our existence as a nation depends entirely on the uncertain props furnished by a judiciary chosen from the same class of depreciated citizenship,—a little more learned in the intricacies of the law, but none the more proof against corruption. In commendation of the grand-jury system a great jurist once said: "In their independent action the persecuted have found their most fearless protectors, and in the records of their doings are to be discovered the noblest stands against the oppression of power, the virulence of malice, and the intemperace of prejudice."

To disparage or destroy the independency is a crime against free government. But the most glaring innovation and usurpation of power was the assumed authority to examine the regularly summoned and duly qualified (according to legislative requirement) grand jurors on their *voir dire*, and to reject some and accept others according to the mere whim and caprice of the judge, and then cause the vacancies purposely created to be filled by persons summoned, by private direction of the judge, by a private person, other than the sheriff or his duly qualified deputies; thus setting at naught the law and the Constitution, and clothing himself with absolute power to determine arbitrarily of what person the grand jury should consist.

Gen. Washington (a man whose patriotism is not now open to question), in his Farewell Address, commenting on party spirit, used this memorable language: "This spirit, unfortunately, is inseperable from our nature, having its root in the strongest passions of the human mind. It exists, under different shapes, in all governments, more or less stiffled, controlled, or repressed; but in those of the popular form it is seen in its greatest rankness, and is truly their worst enemy." 1 Mes. Pres. 218. Partisan prejudice and passion thus recognized pervade our whole political system, from the highest court to the humblest citizen in the land. It is stronger and more pronounced in some persons than in others. There may be those who are entirely free from it, but such is not the rule. On the other hand, there are those of such ardent and zealous dispositions as to be unable to repress their feelings or brook opposition, so that they are wholly incapacitated from doing justice to those who do not affiliate with them politically. Clothed with the power, they would make a holocaust of their foes, while they are ready to canonize their friends, in whom they can see no guile. This is to be deplored, and is a blot upon the fair name, and a hindrance to our country's progress. But it is a fact that can neither be parried, denied, nor ignored. Not a theory, but a condition of degenerate human nature, which must be met and repressed by gentle, firm and judicious measures, to insure the perpetuity of self-government. It would be destructive of the peace of the land,

and productive of continual strife, recrimination, and bitterness, if judge or juror was subject to direct challenge because of partisan prejudice or bias. Hence such a challenge is contrary to public policy. But the reservations and limitations of the constitution were conceived by wise statesmen, and intended to remedy this great and dangerous evil, and restrict it within minimum and reasonable bounds. None of these are more potent for good in furthering the design of their conception than the requirement that the legislature shall not enact special, but shall enact general, laws regarding all subjects of legislation, where the same can be made applicable. General laws secure equal rights to, and impose equal burdens on, all citizens alike. And the protection of the citizen against partisan passion and private enmity under color of the discharge of official duty was the real great object had in view when it was made the duty of the legislature to provide by general law for the summoning and impanneling of grand juries. To allow special legislation in such cases would operate harshly, unequally, and unjustly; and if the courts are permitted to disregard such general legislation, and arbitrarily adopt methods of summoning and impanneling grand juries, constitutional limitations and securities would be rendered of no effect. The courts would enjoy the privilege of legislation denied to the legislature, and could thereby repeal, alter, or amend general legislation so as to make it special, and produce the very inequality of rights and burdens the Constitution seeks to obviate. The mere fact of immediate execution as against one person would not change it from a legislative to a judicial act. Place such power in the hands of an unscrupulous or vindictive partisan judge, with a prisoner of opposite politics in custody, and how promptly will such judge, under the influence of private spleen or party pressure, make up a grand jury selected from his partisan constituents, and thus produce a partisan, biased, and pliable body of men, ready to respond to the illegal instructions of the judge, in mere reflection of his will, and persecute a person for his politics, rather than punish him for crime. Because such power is dangerous in the hands of the unscrupulous or malicious, it is denied to all. The rain, to produce equality, must fall on just and unjust, partisan

and non-partisan alike. To obviate the difficulty of partisanship, the legislature has provided for the selection of jurors, as near as may be, by lot, limited to a given number of the better class of citizens subject to jury service; not authorizing the sheriff to supply any other than adventitious vacancies. To the judge no power is given in the selection of grand jurors, but he is removed from partisan bias and temptation. The law, properly enforced, of its own vigor makes the selection without his assistance. His duty is to see that the law is enforced. This is the method approved by experience and reason as the most fair and just to every person likely to be charged with crime. And, while not wholly free from objection, a better is yet to be devised by the increasing wisdom of the future. Grand jurors selected in this manner are not subject to challenge for any cause,—not even for partisan bias or prejudice, be it ever so pronounced or bitter. 3 Rob. Prac. pp. 88, 89, 92; Matth. Cr. Law, 111, note; *State* v. *Hamlin*, 47 Conn. 95; *People* v. *Northey*, 77 Cal. 618, (19 Pac. 865, and 20 Pac. 129); *Com.* v. *Woodward* (Mass.), 32 N. E. 939; 1 Kelly's Rev. St. W. Va. 433.

The guaranteed right of the accused is nothing more than to have the grand jury selected in accordance with the law as written, and this he may demand as the palladium of his liberties and his city of refuge. It may be possible that under this system the guilty may sometimes escape merited punishment. Far better that this should be the case than that judicial despotism should be enthroned as a permanent part of our jurisprudence. The favorite and probably conscientious argument in justification of the infamous judges of history was that the king's enemies could not be punished by the ordinary methods of judicial procedure, and therefore extraordinary and extrajudicial means must be invented, as a *denier* resort, to preserve and vindicate the majesty of the law. It is here urged, with a show of sincerity and conscientious discharge of duty, that because two grand juries, composed of thirty-two upright citizens, duly qualified and chosen in the manner provided by general legislative enactment, refused to indict, the judge was justified in adopting extralegislative means to obtain an impartial grand jury that would indict the prisoner. "Impartiality" is made synonymous with

"indictment." To be impartial, the grand jury must agree with the impartial opinion of the judge that the prisoner should be indicted for murder if a homicide, not denied, was shown in evidence. In other words, it must reflect the will of the judge, or be discharged with a public and extrajudicial rebuke. If this is not the exercise of despotic judicial power, such a thing is impossible, and *Magna Charta* is the monumental mistake of the ages. But it is said in mitigation thereof and in apology therefor that this was only a grand jury, and the prisoner is entitled to his trial by petit jury. If the same extralegislative methods in disregard of general enactment are to be resorted to in the summoning, impaneling, and charging a petit jury, the same rank injustice may be expected to follow as the certain result. The ancient legal and religious maxim is equally applicable to the judiciary as to witnesses: "He that is unjust in little will be unjust in much." "False in one thing, false in all."

My conclusion, therefore, is that the circuit judge, in summoning, impaneling, charging, and controlling the third and last so-called "grand jury," exceeded his legitimate powers and jurisdiction, in violation of the express limitations of the Constitution and the guaranteed rights of the prisoner, and that the indictment obtained by such illegal methods is void, and that the trial thereof should be prohibited. The guilt of the accused is not now in question. The guilty, until convicted, are entitled to the same rights and securities as the innocent. The respondent claims to set out the evidence as detailed before the several grand juries. If true, it makes a clear case for indictment, and it is inconceivable that a legal grand jury should refuse to indict. But the statement of the evidence is controverted by affidavit, and by two legally selected grand juries refusing to indict,—the last in disregard of positive and illegal instructions of the judge,—and by the alleged necessity of illegally obtaining and controlling an alleged impartial grand jury before an indictment could be obtained. This is undoubtedly sufficient to raise the presumption that the possibility of convicting the prisoner on a charge of murder, if a fair trial in accordance with law be afforded him, is but slight. And it being inhuman, contrary to the bill of rights, and wholly unnecessary, even

in response to popular and partisan clamor, to punish before trial and conviction, the accused should be admitted to bail, if thereby his appearance to answer any legal indictment that may be preferred against him may be secured. Nor are these conclusions in any manner harsh to the prosecution. For, if the prisoner's guilt is as claimed by the respondent, a grand jury summoned and impaneled according to legal methods will not hesitate to indict him ; and it is to the glory and honor of the State that its just and impartial laws as written in its statute books should be upheld and vindicated for the welfare and peace of all its citizens, rather than that the despotic usurpation and abuse of legitimate power on the part of its judiciary should be excused or palliated, much less extolled, justified and defended for future precedent. That state is alone worthy of the name that can throw around the property, liberty, and life of its meanest citizen the protecting ægis of just, fair, and equal laws, administered according to the plain letter thereof, without fear, favor, or affection, by a pure, impartial, and incorruptible judiciary, unmoved by party passion, clamor, or enmity. The writ should be awarded as a matter of right.

After an order had been entered refusing a writ of prohibition in the foregoing case, the counsel for petitioner moved for a rehearing, which motion was overruled by a divided court; and Judge Dent filed the following note :

Note by Dent, Judge :

I am in favor of reargument of this case, and believe it should be granted. This being a matter of original jurisdiction, the result of a divided court is simply null. It determines nothing, but leaves the controversy as though there had been none. This Court owes it as a duty to the public to reach an agreement and decide the case, if possible. Both divisions may be wrong, but both cannot be right. Whichever may be wrong may be placed right on a reargument. Not only this, but the rule should be, in case of a divided court, that a reargument ought to be had, as a matter of judicial respect and concession, at the instance of a single judge, without regard to his position ; for, if he is open to conviction on reargument, the court may arrive at an agreement and decision, and thus discharge its official trust in a beneficial manner to the public. Yet I recognize that such rule cannot be established except by concurrence of a majority of the Court, as affirmative action is required. Two members thereof, while they prevent, are powerless to produce, results, when negatively op-

posed by the others. No case should be left undecided when there is a possibility of agreement. I unhesitatingly say that, while I have a positive opinion, I do not cherish it as infallible, but I am open to conviction, ready to be convinced of error, and earnestly desirous that the law of this case should be properly, finally, and rightly determined and settled. Here at Charles Town I have been unable to find the authorities necessary to a thorough and exhaustive examination of the questions involved, and for this reason my conclusions are embryotic.

*Denied.*

# CHARLES TOWN.

Submitted September 3, 1897—Decided September 14, 1897.