STATE OF WEST VIRGINIA

*v.*

ALBERT YOUNG

(No. 10277)

Submitted September 13, 1950.  Decided October 24. 1950.

772

*Watts, Poffenbarger & Bowles, Martin C. Bowles,* for plaintiff in error.

*William C. Marland,* Attorney General, *George W. Stokes,* Assistant Attorney General, *Thaddeus D. Kauffelt,* Special Assistant Attorney General, for defendant in error.

Fox, JUDGE:

On September 27, 1949, a grand jury attending the Intermediate Court of Kanawha County returned an in-

dictment against Albert Young and Sigsbee Young for armed robbery, alleged to have been committed in and upon Mrs. George W. Jenkins in the month of July, 1949. The case came on for trial on November 1, 1949. No demurrer was interposed to the indictment. The defendants demanded separate trials, and the State elected to try Albert Young. He pleaded not guilty to the offense charged against him, and a trial was had on the said indictment and the plea thereto, resulting in a verdict of guilty. A motion to set aside said verdict on grounds assigned at the time was overruled, and the defendant was sentenced to confinement in the penitentiary of this State for a term of twenty-five years. A petition for writ of error to said judgment was filed in the Circuit Court of Kanawha County on February 25, 1950, and was denied on April 7, 1950, and to that judgment this writ of error was granted by this Court on May 8, 1950.

Mrs. George W. Jenkins was the victim of the robbery alleged in the indictment. She, with her son, was engaged in the feed business in an establishment located on Slack Street in the City of Charleston. Mrs. Jenkins testified that on Monday, July 18, 1949, a person entered her office, while she was alone therein, and ordered two sacks of feed. She was sitting at her desk in said office, and while proceeding to enter up a record of the order, and at a time when she was adding the State tax to the amount of said order, said person moved around to her left elbow, put his hand in his hip pocket, and ordered her to get back from the desk, and that when she glanced up in surprise he repeated "Get back from the desk there and stand and not follow me." She did as she was told, and got behind a refrigerator located in the office. When asked "Were you afraid of him?" her reply was "Well, naturally." She stated that "When he told me to get back and I looked up at him he had his hand in his pocket." And when asked "Had his hand been in his pocket before that time?" she replied "I didn't notice it, I don't think so." He made no statement that "This is a stick-up" or anything of that kind. The robber went straight to the closed desk drawer and took out, without hesitation, the left top desk drawer

that had the money in it and left the room. This desk contained between $600.00 and $700.00 in currency, and some checks, and the aggregate of the currency and checks taken was a little over $800.00. As he left the room, Mrs. Jenkins testified that she noticed a truck sitting outside, and that the robber went towards the truck, but she did not see him get into the same; nor did she secure the license number of the truck, and she did not know what kind of a truck it was. The truck was then driven in the direction of Elk River. On the trial of the case, Mrs. Jenkins positively identified the man that robbed her as being the defendant Albert Young. She also testified that she had the impression that she had seen him at sometime before that date, but of that she could not be sure.

Dennis Gaylor was introduced as a witness by the State and testified that he remembered the afternoon when the Jenkins Feed Store was robbed, and that he was working on the other side of the street from the office where the robbery occurred, in a warehouse used in the Jenkins feed business. He first noticed the truck when it was pulling out from the office and judged it was a chevrolet truck, but could not say for sure; that it was a new truck; that when it left the office it was traveling at a good speed of from fifteen to twenty miles per hour, and travelled up Slack Street in the direction of the incinerator; that at this time Mrs. Jenkins called from the office and said someone had her money, and that it was the man in the truck that pulled out; that a Mr. Clay who was there at the time got in his automobile and followed the truck. The witness stated that he did not see how many persons were in the truck, and that he was unable to identify any person who may have been therein. Henry Clay was then introduced as a witness for the State, and testified that he was on the feed store premises at the time of the robbery, and that it occurred about four forty-five in the afternoon; that after the robbery, the truck pulled out at high speed and went out the road, and that Mrs. Jenkins came out on the sidewalk in front of her store

and said "Stop that green truck, I have been robbed." The witness stated that he didn't notice the truck in front of her store, but at the time she made her statement that the truck had gone five hundred feet from the Lido Club. He then ran and jumped into his automobile and tried to get out of the gate so he could get the license number of the truck, but on account of two or three trucks passing at the time, he was delayed in getting through the gate, and when he did, the truck was out of sight. He stated that he paid no attention to the truck when it passed the warehouse, but when Mrs. Jenkins hollered "stop that green truck" there was a half-ton, pick-up truck in view, though all he could see of the truck was its rear end. It will be observed from the foregoing that Mrs. Jenkins was the only person who claims to be able to identify the person who robbed her, but it seems clear that there was a half-ton pick-up truck at and around the feed store premises at the time of and after the robbery, and that it travelled away from the place of the robbery at a high speed.

The defense interposed by the defendant is an alibi. He claims that he was at his home on Elk Two Mile Creek all of the day of July 18, 1949, the date when the robbery was committed. Albert Young testified to this effect and is corroborated by his wife, Garnet Virginia Young, and by George Nunley, Leon Skiles and Arthur McNeely. Young and his wife testified positively that he was at his home all of that day. George Nunley testified that he went to the home of Albert Young about four o'clock on the evening of July 18, 1949, and found Young there. Leon Skiles testified that he went to the Young' home the same evening, remained there ten or fifteen minutes, left at 4:37 P. M., and that Albert Young was then at his home. Leon Skiles testified that when he arrived George Nunley was also there. Arthur McNeely merely passed Young's home and noted that he was at home, and that was in the afternoon about the time when the robbery occurred.

As stated above, on the trial of the case, Mrs. Jenkins

positively identified Albert Young as the person who robbed her. It is obvious, of course, that the identification of Young, and the contention of the defendant that he was at home all of the day of July 18, 1949, the date of the robbery, are linked together. This requires consideration of the reasonableness and credibility of the testimony of Mrs. Jenkins, as the same is corroborated by Gaylor and Clay, as well as the testimony of Young that he was home that day, and the testimony of the persons who tend to corroborate his statement. It appears that Young was arrested at his home on Elk Two Mile late in the evening of July 25, 1949, and that he was immediately taken by the arresting officers to the home of Mrs. Jenkins on Sissonville Road near Charleston. There is some conflict, but more confusion, as to what occurred when Young was taken to the home of Mrs. Jenkins on that occasion. On cross examination of Mrs. Jenkins by counsel for the defendant, referring to statements to the police as to the first time she saw Young after the robbery, this question was asked: "Did not you tell them the first time you saw Albert Young that you could not be certain if he was the man or not?", to which she answered: "No, no, I don't think I told them. I felt sure he was the man." She was then asked: "Mrs. Jenkins, I will ask you again if you did not tell those police officers that you could not and would not be certain at that time that Albert Young was the man that robbed you?", to which she replied: "I told them I felt sure it was." She was then asked: "You are not answering my question. I am asking you if you did not tell them that you could not and would not be certain that Albert Young was the man that robbed you. You can answer that yes or no.", to which she replied: "I have no recollection of telling them that." She then stated that she had a clear recollection of counsel for defendant and Mr. John T. Copenhaver talking with her sometime before the trial, and following which she was asked: "Did not you tell both Mr. John Copenhaver, your lawyer and me that when these officers brought Albert Young to you the first time you were not certain he was the man, and you told them you were not certain?", to which she

answered: "It was late. My impression was it was the man. They—" And when asked: "They what?", she replied: "I don't remember. I felt sure it was the man at that time." And when asked: "Did not you tell them you were not certain it was the man?", she answered: "Well, I can't tell you that." And when asked: "Can you state you did not tell them that?", she replied: "I can only tell you that I told them I thought it was." It appears that on the next day she went to the police station or jail where Albert Young was confined and had a further look at him, after which a warrant was sworn out charging Albert Young with the crime. John T. Copenhaver was introduced as a witness in behalf of the defendant, and testified that he went to the place of business of Mrs. Jenkins about ten days before the trial along with counsel for defendant. He was asked this question: "I will ask you whether or not in that conversation with Mrs. Jenkins if she didn't tell me that when she saw Albert Young the first time that he was brought to her home by the police officers, that she wasn't certain that he was the man that robbed her?", to which he answered: "Yes, sir, that is just about what she said. I think—", and the witness was prevented from stating what he thought. Later in his testimony, Mr. Copenhaver testified, without objection, the following: "I wanted to say that Mrs. Jenkins is a very fine woman and that most of us can be mistaken. I feel in this respect that Mrs. Jenkins perhaps became a little confused and, although not intentionally, misrepresented herself to the police."

When we come to the testimony tending to support the alibi defense, we must, of course, recognize the interest of Albert Young and his wife in the result of the trial then being had. Both Young and his wife were competent witnesses to testify in the case, and their testimony should be given consideration. The testimony of George Nunley to the effect that he was at the Young' home about four o'clock on the evening of July 18, 1949, is, in some measure, contradicted by the testimony of George Nunley, Jr., a police officer in the City of Charleston, and the son of

George Nunley, to the effect that between three twenty-five and three forty in the evening of July 18, 1949, he talked with his father on Summers Street in Charleston for a period of from ten to fifteen minutes, and he fixes this time by reference to the time when he was permitted to go off duty. He testified that he was relieved at three thirty that afternoon. The home of the defendant is some eight miles from Charleston, and George Nunley testified that in going to said home he took a bus on Capitol Street in Charleston and alighted therefrom on the south side of Kanawha River opposite Reed, crossed the river in a row boat ferry, walked up the bank of the river some distance and started over the hill towards the Young' home, and that he was picked up by someone, and transported in an automobile to the Young' residence. The evidence tends to show that it would have been impossible for him to make this trip after his conversation with his son in Charleston, and reach the Young' home by four o'clock. Leon Skiles testified that when he was at the Young' home on that evening George Nunley was there. Obviously if George Nunley was not there, this tends to weaken the testimony of Skiles. It is in evidence that Skiles was under probation for some offense at the time he testified. Arthur McNeely first stated unequivocally that he saw Young at his home on the evening of July 18, 1949, but on cross examination stated that he could be mistaken about the time of day, and that he was not positive about the date. One Wade E. Spradling testified, at the instance of the State, that shortly after noon on July 18, 1949, the day of the robbery, he saw Albert Young and Sigsbee Young in a green chevrolet truck on the road between Reed and the Young' home. This testimony was introduced in chief, but clearly can only be considered in connection with defendant's contention that he was home all of that day. The mere fact that Albert Young and Sigsbee Young were seen in a green truck does not have a perceptible bearing on the question of whether or not Albert Young was later at the Jenkins Feed Store and committed the robbery alleged against him.

The question of identification of the defendant was one for the jury upon consideration of all of the testimony and circumstances of the case. The identification of Young rests solely upon the testimony of Mrs. Jenkins. Her early uncertainty, if such existed, and there is evidence tending to show that for a time she was uncertain on that point, is to be considered, as is her apparent desire to be certain in her mind thereon. She is corroborated, to a limited extent, by Gaylor and Clay.

We would not be justified in disturbing the verdict based on the conflict in the evidence indicated above. It is quite evident that the jury believed Mrs. Jenkins, and was not convinced of the truth of the testimony tending to establish the claimed alibi. The jury had to believe one of the two stories, and their verdict shows that they believed Mrs. Jenkins. The trial judge approved the verdict. He was present at the trial, and, like the jury, saw the witnesses, heard them testify, and observed their demeanor. In these circumstances, we cannot say that the jury and the trial court were wrong in their conclusion. To do so would be to transgress the well known rule that a verdict of a jury, on conflicting testimony and circumstances, where the jury has been properly charged on the applicable law, will not be disturbed by this Court unless plainly wrong, or without any evidence to support it.

But the defendant says the evidence was, in no event, sufficient to convict him of the crime of armed robbery. Of course the defense is that there was no robbery of any character committed by Albert Young, and in raising the question of whether or not the crime committed was armed robbery does not in anywise yield this position. This contention requires careful consideration.

We think we are correct in saying that there is no statutory definition of the crime of robbery, although in some of its aspects it is referred to in Code 61-2-12. At common law, robbery was defined as "The felonious taking of money or goods of value from the person of another or in his presence, against his will, by force or putting

him in fear." 46 Am. Jur. 139. By Chapter 118, Acts of the Legislature, 1882, Code, 1923, Chapter 140, Section 12, it was provided: "If any person commit robbery, being armed with a dangerous weapon, he shall be confined in the penitentiary not less than ten years; if not so armed, he shall be confined therein not less than five years." Code, 61-2-12, amended the 1923 Code in 1931, by enacting the following:

"If any person commit, or attempt to commit, robbery by partial strangulation or suffocation, or by striking or beating, or by other violence to the person, or by the threat or presenting of firearms, or other deadly weapon or instrumentality whatsoever, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than ten years. If any person commit, or attempt to commit, a robbery in any other mode or by any other means, except as provided for in the succeeding paragraph of this section, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than five years."

The question of what constitutes armed robbery is raised by defendant's Instructions Nos. 1, 2 and 3, and particularly No. 2, all of which were tendered by the defendant and refused by the court. Instruction No. 1 reads: "The Court instructs the jury to find the defendant not guilty." Instruction No. 2 would have told the jury: "The Court instructs the jury that you cannot find the defendant guilty of armed robbery." Instruction No. 3 reads as follows: "The Court instructs the jury that you cannot find the defendant guilty of unarmed robbery."

The indictment refers to firearms, but no one saw such a weapon. The most that can be said is that whoever robbed Mrs. Jenkins made a gesture indicating that he had such weapon when he put his hand in his hip pocket. Mrs. Jenkins testified that she thought he had a gun and, in effect, that she was afraid. Following such gesture, and while in fear, she did what he commanded her to do, under apprehension of what he might do in case she re-

fused. We refer to our present statute which uses the statement "or by the threat or presenting of firearms", leaving out the words "or presenting", the language reads "or by threat of firearms". Properly interpreted, we think the statute clearly means that if a person commits or attempts to commit a robbery by the threat of firearms he is guilty of a felony, and guilty of the offense of armed robbery. We can give the statute no other construction. In our opinion, if a man enters a room, finds a defenseless woman alone, throws his hand into his hip pocket and commands her to take a certain position and remain there and not follow him, and then commits robbery, he is guilty of armed robbery. Unquestionably, he places her in fear to the same extent as if he had drawn and presented a pistol or other deadly weapon. Our statute recognizes that robbery may be committed by fear and so does the common law. When robbery is committed by force, the element of fear need not exist, but it may be committed without force by putting a person in fear. This is what happened in this case, and Mrs. Jenkins had the right to believe that he had a deadly weapon in his possession, and that he might use the same unless she obeyed his command.

The presentation of a deadly weapon is not always necessary to place a person in fear. The apprehension that the person attempting a robbery has in his possession a deadly weapon, and the fear that he might use the same, is just as effective to place one in fear as if the weapon is drawn and presented. While not exactly analagous, it is well known in our criminal practice that the theory of self-defense in homicide cases is often established to the satisfaction of a jury by showing that the deceased, before the fatal event, had made a gesture indicating that he had in his possession a deadly weapon; and quite often this is made the basis of a claim that a defendant acted in self defense, and for jury findings in such circumstances that a person had the right to act to save himself from great bodily injury or death. Usually this rule is established in cases where there is a quarrel, and some character of violence is to be apprehended; and in some cases,

but not all, there may be words accompanying the gesture which, naturally, adds to the apprehension of the person who is charged with the homicide.

It is fundamental that there can be no valid conviction of a person charged with crime unless, when requested, proper instructions are given to the jury on the legal phases of the case being tried. Numerous questions are raised in this case as to the rulings of the court on the instructions. We have considered all of these objections, and are of the opinion that the jury was properly instructed. The State offered no instructions. The defendant offered sixteen instructions, three of which were peremptory and were refused. Those were Instructions Nos. 1, 2 and 3, and are quoted above. Of the other thirteen instructions, Nos. 4, 5, 6, 7, 8, 9, 12, 14 and 16 were given, and Nos. 10, 11, 13 and 15 were refused. Of the instructions refused, No. 10 would have attempted to define reasonable doubt. Instructions of this type have always been discouraged by this Court, and where the jury is instructed, as in this case, that it could not find the defendant guilty unless his guilt had been established beyond all reasonable doubt, it is not error to refuse instructions which attempt to define reasonable doubt. Among the many cases which show that this Court does not encourage instructions attempting to define reasonable doubt are: *State* v. *Powers,* 91 W. Va. 737, 752, 113 S. E. 912; *State* v. *Zink,* 98 W. Va. 340, 128 S. E. 114; *State* v. *McDermott,* 99 W. Va. 220, 128 S. E. 108; *State* v. *Sprigg,* 103 W. Va. 404, 137 S. E. 746; and *State* v. *Summerville,* 112 W. Va. 398, 164 S. E. 508. In this case the jury was instructed that they must believe the defendant guilty beyond all reasonable doubt. As this Court has said: "The ordinary jury knows what a reasonable doubt means, and attempts to define it are discouraged. They but tend to confuse. *State* v. *Worley,* 82 W. Va. 350, 356, 96 S. E. 56; *State* v. *McDermott,* 99 W. Va. 220, 221, 128 S. E. 108." *State* v. *Summerville, supra.*

Instruction No. 11, offered by the defendant, was refused as being covered by the other instructions. Said

instruction would have told the jury: "The Court instructs the jury that in considering the evidence in this case, if any part or portion of that evidence creates in the minds of the jury a reasonable doubt as to the guilt of the defendant, then the jury must find him not guilty." Instruction No. 5, given by the court at the instance of the defendant, told the jury that: "The jury is further instructed that the law presumes the defendant to be innocent in this case and not guilty as charged in the indictment, and this presumption should continue and prevail in the minds of the jury until they are satisfied by the evidence beyond all reasonable doubt of the guilt of the defendant; and acting on this presumption, the jury should acquit the defendant unless convinced by the evidence, beyond all reasonable doubt, of his guilt." Instruction No. 8, likewise given, told the jury: "The Court instructs the jury that the defendant is, by law, presumed to be innocent, and that it is the duty of the State to prove him guilty as charged in the indictment, beyond all reasonable doubt; that if the State fails to prove every material allegation in the indictment, then the jury must find him not guilty." Instruction No. 13, offered by the defendant and refused, would have told the jury that: "The Court instructs the jury that if, after considering the evidence in this case, you should entertain any reasonable doubt as to whether Albert Young has been identified as the person who committed the offense in the indictment, then you should find Albert Young not guilty." Defendant's Instruction No. 14, given by the court, told the jury: "The Court instructs the jury that under the indictment in this case the burden is upon the State to prove to the satisfaction of the jury, beyond all reasonable doubt, the presence of Albert Young at the time and place alleged in the indictment, and if you, or any of you, after considering all of the evidence in this case entertain a reasonable doubt as to the presence of Albert Young at the time and place of the alleged crime, you should find Albert Young not guilty." The distinction between the language used concerning the identification of the person who committed the offense charged

in the indictment, contained in Instruction No. 14 and the language if you "* * * entertain any reasonable doubt as to whether Albert Young has been identified as the person who committed the offense (charged) in the indictment * * *", used in Instruction No. 13, is not discernible to this Court. Both instructions mean the same thing. Instruction No. 15, which was refused, reads as follows: "The Court instructs the jury that if you believe from the evidence in this case that Albert Young was at his home at the time the crime alleged in the indictment was committed, then you should find the defendant not guilty, and you are further instructed that if from the evidence in this case you should entertain a reasonable doubt as to whether Albert Young was at his home at the time the alleged crime was committed, then you should resolve the doubt in favor of the defendant, and find him not guilty." Instruction No. 14, quoted above, told the jury that if they entertained a reasonable doubt as to the presence of Albert Young at the time and place of the alleged crime, they should find him not guilty. It was not necessary, we think, to stress this point. The jury was told in no uncertain terms that proof of the presence of Albert Young at the time and place of the alleged robbery was vital to the State's case, and that they had to believe, beyond all reasonable doubt, that Young was present at that time. That question is the gist of this case, and throughout the instructions was so clearly presented that Instruction No. 15 would not have added anything to what had already been stated in the other instructions given.

It is fundamental law that in a criminal case a trial court should exercise the utmost care to properly instruct the jury on all of the law applicable to the evidence introduced in a case on trial; but the court is not required to repeat instructions already given. *Aliff* v. *Berryman,* 111 W. Va. 103, 160 S. E. 864. As is well known, statements of law may be correctly made in many forms of language. One correct statement of a legal principle involved in a trial of a case should suffice. Repetition would serve no good purpose and often causes confusion. When all legal elements of a case are properly covered by in-

structions, a trial court commits no error when it refuses to further instruct the jury even though additional instructions, in themselves, may state sound law. So far as we can observe, each of the instructions refused in this case stated sound law; but other than Instruction No. 10, they were clearly covered by other instructions given at the instance of the defendant, and we do not think he was in anywise prejudiced by the refusal of the court to reiterate law already correctly stated. We think the defendant has had the benefit of correct statements of the law applicable to all questions of fact arising in this case. He was given the benefit of instructions that to convict him the jury must believe his guilt beyond all reasonable doubt; that he was presumed to be innocent, and such presumption was not a mere form of law but an essential and substantial part of the law of the land; that the indictment did not raise any presumption against him; and that every material allegation of the indictment must be established beyond all reasonable doubt. The jury was also told that Albert Young was a competent witness in his own behalf, and that, in view of the defense asserted, that unless they believed, from the evidence, beyond all reasonable doubt, that Young was present at the time and place of the alleged crime, they should find him not guilty; that the testimony touching former convictions of the defendant would be considered only on matters effecting his credibility; and that such convictions created no presumption against him as to his guilt or innocence of the crime charged. These are clear and correct statements of the law applying to every defense that could have been made under the testimony in this case.

Another question raised requires comment. It appears from the record that counsel for the defendant, having knowledge of the former conviction of the defendant for armed robbery, and of his having served in the penitentiary of this State for a term of years, on account of such conviction, brought this fact to the attention of the jury in his opening statement, and we think we are justified in assuming, although the record is not specific on

that point, that he also told the jury that defendant's defense would be based upon the contention that he could not have committed the crime alleged against him because he was at his home all of the day when the said crime was committed. After this statement was made by counsel for defendant, the record shows the following: "Counsel for the State now asks the question whether or not you will believe Mrs. George Jenkins on the one hand, or the evidence of the defendant, who Mr. Watts has stated has served two terms in the penitentiary, on the other hand." Objection was made to this statement at the time, which objection the court overruled, to which ruling the defendant excepted, and the same is now asserted as error. In the argument of the case, the prosecuting attorney again referred to the jury's responsibility in determining the question of fact upon the testimony of Mrs. Jenkins and the defendant. During the course of the trial, defendant's counsel caused the defendant to state that he had been convicted of armed robbery in two cases, and had served penitentiary terms, running concurrently, for said offenses, and to make other statements in regard to his being charged with or convicted of misdemeanors. On the whole, we do not think the defendant was prejudiced by anything the prosecuting attorney said. Clearly, under our law, the defendant could have been interrogated as to these crimes as bearing upon his credibility, and particularly so when he elected to testify. *State* v. *Friedman,* 124 W. Va. 4, 18 S. E. (2d) 653; *State* v. *McMillen,* 127 W. Va. 197, 32 S. E. (2d) 625. Apparently, defendant's counsel first brought before the jury the undisputed fact of defendant's criminal record. It must have been clear to the jury from the beginning that the vital question in the case on trial was the identification of the defendant as the person who robbed Mrs. Jenkins, and that on that question the testimony of Mrs. Jenkins and the defendant would be entitled to first consideration. In fact, the case rested, to a very large degree, on which of these two witnesses the jury should believe. This was a question that could not be escaped. Its presentation, in the very beginning of the trial, in view of all the circum-

stances of the trial, could not, in our opinion, have had any prejudicial effect on defendant's case.

We find no prejudicial error in the introduction of testimony. Aside from finding no specific error in this respect, the questions raised could have had no prejudicial effect in the trial of the case either for or against the defendant. Perhaps it was not a perfect trial, and it is rare indeed that there is such a trial. That such a trial is not necessary, has been long settled in this State. *State* v. *Rush,* 108 W. Va. 254, 150 S. E. 740.

On the whole, we find no error in the trial, and, therefore, the judgment of the Intermediate Court of Kanawha County, and that of the Circuit Court of said county, on writ of error, stands affirmed.

*Affirmed.*