STATE OF WEST VIRGINIA

*v.*

BILL HOWARD

(No. 10429)

Submitted September 17, 1952. Decided November 11, 1952.

*Marcum & Gibson* and *J. J. N. Quinlan,* for plaintiff in error.

*John G. Fox,* Attorney General, *Thaddeus D. Kauffelt,*

Assistant Attorney General, *Edward H. Greene,* Prosecuting Attorney, *C. M. Morgan,* Assistant Prosecuting Attorney, for defendant in error.

RILEY, PRESIDENT:

The defendant, Bill Howard, was indicted and convicted in the Common Pleas Court of Cabell County for selling, and aiding and abetting the sale of alcoholic liquor without a State license. The judgment of conviction was affirmed by the Circuit Court of Cabell County. To the order of the Circuit Court of Cabell County, affirming the judgment of the common pleas court, this writ of error is prosecuted.

The grand jury, which returned the indictment, was summoned upon an order entered on July 26, 1950, by the Common Pleas Court of Cabell County, directing M. C. Blake, the clerk thereof, to issue a *venire facias,* returnable July 28, 1950, commanding the jury commissioners of the common pleas court to appear in the clerk's office and draw from the grand jury box the names of sixteen qualified citizens according to lot to act as grand jurors and to appear before the court as grand jurors on August 3, 1950, at nine o'clock a. m.

To the indictment the defendant filed a plea in abatement alleging that, contrary to the order of the common pleas court on July 26, 1950, *the clerk of the circuit court* issued a *venire facias,* summoning Elmer Canterbury and Robert S. White, jury commissioners, to draw sixteen qualified persons to serve as grand jurors for the *June, 1950, term,* of the Common Pleas Court of Cabell County, although the grand jury for the June, 1950 term of that court had been convened on June 5, 1950, and, after performing their duties, had adjourned and were discharged on June 6, 1950; that though Elmer Canterbury and Robert S. White were jury commissioners of the common pleas court, M. C. Blake, Clerk of the Common Pleas Court of Cabell County, and C. M. Gohen and Robert S. White "certified that they, as jury commissioners, in the presence of each

other," drew the grand jurors, which the plea in abatement alleges is contrary to the statute laws of the State of West Virginia; and that the Sheriff of Cabell County certified that the list of grand jurors was drawn for "the June term, 1950" of the Common Pleas Court of Cabell County, which list had been delivered to him by "M. C. Blake, Clerk of the Common Pleas Court of Cabell County, West Virginia, and C. M. Gohen and Robert S. White, Jury Commissioners of Cabell County."

To the plea in abatement the State of West Virginia demurred. At the time of the hearing on the demurrer to the plea in abatement, counsel for defendant moved to quash the *venire facias,* summoning the jury commissioners, and challenging the array of grand jurors, and the court, overruling the defendant's motion and challenge, sustained the demurrer to the plea in abatement. On this state of the pleadings the case proceeded to trial.

To the indictment the defendant filed a demurrer based upon the ground that the indictment is defective because, in addition to charging the illegal sale of alcoholic liquor, without a State license, it charges the defendant with aiding and abetting in the sale thereof, without alleging the name of the principal aided and abetted, if known, or alleging that the name of the principal is unknown. The trial court overruled the demurrer.

On cross examination State's witness Corporal Paul R. Pritchard of the West Virginia Department of Public Safety, whose name appears as the prosecuting witness in the indictment, testified that he did not appear before the grand jury, and, thereupon, the defendant moved to quash the indictment on the ground that though the indictment bears the name of the witness Pritchard, he testified he did not appear before the grand jury.

In June, 1949, Fred Turner leased from the Mossman Estate property known as Nos. 733 and 735 Seventh Avenue, in the City of Huntington, and operated an establishment thereon which he called the "Fellowship Club".

About May 1, 1950, Turner entered into an arrangement

with the defendant Howard, whereby the latter became the one-half owner of the establishment and opened what is designated in the record as the "Oriole Club". Later Howard took over the entire lease. On June 1, 1950, he made a new lease with the Mossman Estate, and the Oriole Club continued to occupy the premises. This club was regularly chartered as a "national fraternal organization", with about thirty charter members. The club had a manager by the name of John Nicely, and Eddie Moore and B. M. Johnson ran the club. The organization had a ritual, a board of trustees, and a women's auxiliary, the president being Lida Young, which auxiliary conducted dances for the members on various occasions, and meetings of the club members and the auxiliary members, were regularly held there. The auxiliary conducted a program at the Veterans' Hospital, in Huntington, and at Christmastime preceding the trial the auxiliary entertained one hundred and eight of the underprivileged children of Huntington, presenting each with a gift and serving refreshments. One member of the auxiliary, Mrs. Ida Mae Blackwell, testified that during the "coming year" the auxiliary was endeavoring to establish a national home for orphans. Mrs. Blackwell further testified that she went to the Oriole Club only on the nights that the auxiliary met.

On August 1, 1950, the night of the State primary election, the defendant Howard had invited the election workers of the political party of which he was a member, to the club, where the election returns were to be received. That night the Prosecuting Attorney of Cabell County made a complaint before Walter P. Rasnick, a justice of the peace of Guyandotte District, Cabell County, for a search and seizure warrant against "John Doe", for the sale of liquor, and also a search and seizure warrant for gambling against the defendant, Bill Howard, both providing for a search of the premises at Nos. 733 and 735 Seventh Avenue. Armed with these search warrants, Corporals Paul R. Pritchard and H. D. Coyner of the West Virginia Department of Public Safety, and Troopers

Jack Milam, Carl Nutt, John Hilliard and W. C. Williams, members of the Department of Public Safety of this State, raided the premises at Nos. 733 and 735, Seventh Avenue. The Prosecuting Attorney of Cabell County, Edward H. Greene, and his assistant, Altha Conner Wheatley, were present and participated in the raid. Two pint bottles of liquor, both partly full, one with whiskey and the other with gin, were taken from the jacket pocket of Eddie Moore, the bartender, who testified that he had taken them from tables at which customers were setting. No other liquor was found by the raiders in the club rooms, but thirteen "shot glasses" were found in the rooms, and in a brown parcel in the garbage can outside the premises about ten full bottles of whiskey, gin, and sloe gin, and two empty bottles labeled "Gordon's Distilled London Dry Gin" and "Haller's Country Fair Straight Bourbon", were found. These were turned over to Corporal Pritchard and were introduced in evidence. In addition two green slips of paper labelled in red "Check No. 2107" and "Check No. 2105", purporting to be guest checks, each containing the notation "2 Hi Balls 1.20" were found on the premises. The State introduced evidence to the effect that some of the glasses on the tables in front of customers contained "alcoholic beverages of some kind."

One Paul Brown, an investigator called by the prosecuting attorney's office from Athens, Ohio, to Huntington, for the purpose of investigating activities in that city in gambling and the illegal sale of liquor, was the State's principal witness. This witness testified that he visited the Oriole Club for the first time about twelve-thirty o'clock on the morning of July 22, 1950, on which occasion he purchased from Eddie Moore, the bartender, whiskey by the drink and beer in bottles, both of which were brought to the table at which the witness and others were sitting; that the persons serving whiskey would go behind the bar, mix the drinks, and bring them back to him and the other persons at the table; that on that night Brown did not see the defendant; that on the morning of July 23, 1950, he purchased at the Oriole Club several drinks

of liquor and beer, but he did not say whether the defendant was in the club at the time; that again on July 28, 1950, he visited the club and attended a dance there; and that it was then that he was introduced to the defendant Howard, but he could not tell how long Howard was at the club on that occasion, as defendant was downstairs and witness was upstairs attending the dance. On August 1, 1950, the night of the raid, he again visited the Oriole Club and purchased some drinks from the bartender, Eddie Moore. This witness is entirely uncorroborated in this record as to any sale of strong alcoholic beverages in the club rooms.

On cross examination Brown testified categorically that at no time did he see defendant have any whiskey in his possession or take a drink of whiskey, or pour a drink of whiskey for anyone, or sell any whiskey. In answer to the question, "Did he [defendant] do anything to help anybody sell any whiskey", the witness answered, "I never saw him sell any whiskey", and upon being asked, "did you see him sell any,", replied, "I never saw him mix any."

Corporal Paul Pritchard, whose name appears as the prosecuting witness in the indictment, though he testified that he was not present at the hearing before the grand jury, testified that on the occasion of the raid he did not see anything in regard to the sale of whiskey or any sale of whiskey; that he did not know of any sale of whiskey; and did not know whether any whiskey was being sold when the witness and other raiding officers entered the premises. Trooper Carl Nutt testified that he did not see the defendant on the occasion of the raid. Trooper Jack Milam testified that he did not find any whiskey at the raid; that no one was searched; that he did not see anybody selling whiskey; and that he did not see the defendant sell whiskey or help anybody sell whiskey or with whiskey in his possession. Trooper Hilliard testified that although he saw Howard on the occasion of the raid, he did not see him sell any whiskey; that the only whiskey he saw was in the two pint bottles which "were partly

filled with whiskey"; and that there was no other liquor there, though he made a thorough search of the premises. Trooper Williams found "a couple of empty [whiskey] bottles behind the bar", when he searched the upstairs room. None of the members of the Department of Public Safety who participated in the raid observed the illegal sale of alcoholic beverages. Corporal Coyner, who was stationed at the back door of the club, did not testify on the question whether there was any sale of whiskey or other strong alcoholic spirits on the premises, while he was there during the course of the raid.

State's witness, Jacob Austin Harper, a school teacher in Cammack Junior High School, in the City of Huntington, testified that he had helped to build the bar on the second floor of the Oriole Club, which services he performed gratis because he was a paid-up member of the organization, and, further testified, that he did not see any whiskey sold over that bar, or any other bar in the Oriole Club. State's witness, Clarence E. Conley, a teacher of industrial arts at Cammack Junior High School, testified that in consideration of membership, initiation fees, and three months' dues, he also assisted in the construction of the bar on the second floor of the club, but the court sustained the State's objection to the question, "I want to ask you whether or not you ever saw any whiskey sold there", on the ground that the cross examination should be confined to the building of the bar. State's witness, George A. Brooks, an employee of Chesapeake & Ohio Railway Company, was asked on direct examination: "I will ask if you made this statement on June the 3d, 1950: 'I went to the Oriole Club at 733-735 Seventh Avenue some time after eight p. m. to watch television, and while I was there I purchased whiskey. I don't remember how much I paid for it' ", to which he answered: "I told you that I went to the Club and that I was drinking and I didn't know whether I purchased it or not." W. A. Nixon, a witness for the State, testified that in July, 1950, he went to the Oriole Club and saw

drinks being served there, but did not know whether "it was whiskey or not."

On the other hand twenty witnesses were called by the defendant, who testified that on the occasion or occasions they were in the Oriole Club they never saw any liquor sold there. These witnesses were either election officials, belonging to defendant's political party who were there on the night of the raid to listen to the election returns, members of the club, members of the women's auxiliary, or members of the band which played for dances there. In particular defendant's witness, Roy Hensley, testified that he had been going to the Oriole Club since June 1, 1950, and was at the club on August 1, 1950, and while at the club on August 1, he was introduced to the prosecuting witness, Paul Brown, and was told by Brown that "he was from Indianapolis, doing some research work for Potter's Nursery or something." This witness testified that on no occasion did he see any whiskey sold at the club, and that he saw Paul Brown seated at a table with two other persons. In answer to the question, "Was there any whiskey sold in that club, to your knowledge", he answered, "Not to my knowledge, no, sir"; and this witness further testified that if whiskey had been sold at the club while witness was there he would have known it. Defendant's witness, Homer Spencer Hayes, leader of the band which played for the dances, testified that at the dances the band was seated on a raised platform; that he saw no liquor sold over the bar; and if liquor had been sold there he would have seen it. Likewise defendant's witness, Jesse B. Simons, a yard clerk for the Ohio River Company, a member of the Council of the City of Huntington, and a member of the Oriole Club, who was present at the club on the night of the raid, testified that neither on that night nor at any other time had he seen any whiskey sold at the club. The testimony of the rest of defendant's witnesses, who were interrogated on the question whether they saw alcoholic liquor sold at the club on the occasions they were there, is to like effect.

The threshold questions are: (1) Whether defendant's plea in abatement should have been sustained because the provisions of Code, 52-2-1, and Code, 52-2-3, setting forth the statutory requirements in regard to the drawing of grand jurors are indispensable, and the failure to comply therewith renders the action of the grand jury in returning the instant indictment void; (2) whether the demurrer to the indictment, which indictment is in statutory form, should have been sustained because it charges the defendant with selling and aiding and abetting the sale of alcoholic liquor and does not state the name of the principal aided and abetted, if known, and if unknown such is not alleged; and (3) whether the defendant's motion to quash the indictment should have been sustained because it states that it was "found upon the testimony of Paul Pritchard", who testified at the trial that he never appeared before the grand jury.

The basic questions are: (1) Whether there is sufficient evidence in this record from which the jury could infer beyond a reasonable doubt that defendant was guilty of the crime charged in the indictment; and (2) whether the trial court erred in giving State's instructions Nos. 1, 2, 3, and 4.

The grounds of attack on the indictment raised by the plea in abatement are: (1) That M. C. Blake, Clerk of the Common Pleas Court of Cabell County, who is also clerk of the circuit court of that county, issued, as shown by the printed record, a *venire facias*, signed by him as "Clerk of the Circuit Court of Cabell County", commanding the jury commissioners, Elmer Canterbury and Robert S. White, to appear on July 28, 1950, and draw sixteen qualified persons for the June, 1950, term of the common pleas court, although the grand jurors for the June, 1950, term had been convened on June 5, 1950, and, after performing their duties, were discharged on June 6, 1950; that the Sheriff of Cabell County on July 28, 1950, certified that he had received the "list of the names of Grand Jurors for the June term, 1950, of the Common Pleas Court of Cabell County" from M. C. Blake, Clerk of the

Common Pleas Court of Cabell County, and C. M. Gohen and Robert S. White, jury commissioners of Cabell County; and (2) that though by order entered by the Common Pleas Court of Cabell County on July 26, 1950, M. C. Blake, Clerk of the Common Pleas Court of Cabell County, was ordered to summon the "Jury Commissioners of this Court" to draw a grand jury, M. C. Blake, Clerk of the Common Pleas Court, and C. M. Gohen and Robert S. White, as jury commissioners, signed the certificate dated July 28, 1950, certifying the list of persons drawn for the grand jury, to which certificate is also attached the certificate of E. M. Midkiff, Sheriff of Cabell County, to the same effect.

Addressing ourselves at this point to the first ground of attack set forth in defendant's plea in abatement, we are of opinion that there is no merit in that ground. In general it may be said that the provisions of Code, 52-2-3, as relate to the issuance of a *venire facias* for grand jurors, are directory. Thus it has been held that the requirement of Code, 52-2-3, respecting the time of the issuance of a *venire facias* for grand jurors is directory, and even the failure to issue such writ will not vitiate an indictment, which is found by a grand jury, selected and drawn in the manner provided by statute, which actually was in attendance and was impanelled and sworn in accordance with the statute. *State* v. *Wetzel,* 75 W. Va. 7, 83 S. E. 68; *State* v. *Hoke,* 76 W. Va. 36, 84 S. E. 1054. Notwithstanding the printed record shows that the *venire facias* was signed and issued by M. C. Blake, Clerk of the Circuit Court of Cabell County, there is on file in the clerk's office in this case a certificate of the Clerk of the Common Pleas Court of Cabell County, certifying a copy of the *venire facias* signed by him as clerk of that court, which the certificate states was the one actually issued by him as Clerk of the Common Pleas Court of Cabell County.

Further addressing ourselves to the first ground, set forth in the plea in abatement, we are of opinion that the fact that *venire facias* directed the regular jury com-

missioners of Cabell County to draw the members of the grand jury to serve for the June, 1950, term of the common pleas court does not vitiate the indictment. Section 8, Chapter 90, Acts of the Legislature, 1917, provides that the terms of the Common Pleas Court of Cabell County (originally the Criminal Court of Cabell County) are to commence on the first Monday in February, the first Monday in June, and the first Monday in October. So, in the absence in this record of any adjournment of the June, 1950, term of the common pleas court, the order of that court of July 26, 1950, was entered, the *venire facias* was issued, the names of the grand jurors were drawn, and the grand jury was convened at the June, 1950, term of the common pleas court.

This presents the question whether the fact that the grand jury for the June, 1950, term of the common pleas court was summoned for and convened on June 5, 1950, and discharged on June 6, 1950, vitiates the drawing and convening of the grand jury, which returned the instant indictment during the same term of court.

The power of the Common Pleas Court of Cabell County to impanel a grand jury initially had its origin in Section 9, Chapter XXVIII, Acts of the Legislature, 1893, creating the Criminal Court of Cabell County. Section 9 reads in part as follows: "The said criminal court shall impanel a grand jury at each term thereof, and said criminal court at a special or adjourned term thereof, whenever it shall be proper to do so, may order a grand jury to be drawn or summoned to attend such term * * *. * * * all of the provisions of chapter one hundred fifty-seven of the Code of West Virginia [Warth's Code of West Virginia, 1891, 3d ed., Chapter CLVII] in regard to grand juries in the circuit court, shall apply, as far as applicable, to grand juries in said criminal court." Section 9 further provides: "The grand and petit jurors serving in said court shall be chosen and impanelled in the same manner as they are chosen and impanelled by law in the circuit court, and shall receive the same compensation as said jurors in the circuit court." This section has never been amended,

except that Section 1, Chapter 90, Acts of the Legislature, 1917, provides that the name "Criminal court of Cabell County", as designated in Chapter XXVIII of the Acts of the Legislature, 1893, shall be changed to "common pleas court of Cabell County." Section 1, Chapter CLVII, Warth's Code of West Virginia, 1891, 3d ed., provides that: "There shall be a grand jury at each term of a circuit court, except that the circuit court of any county, by an order entered of record, or the judge thereof in vacation, by a written order to the clerk of the court at least twenty days before the term, may dispense with the grand jury for one of the three terms required by law to be held in said county annually, and in such case no grand jury shall be drawn or summoned to attend such term until ordered either by the court or the judge thereof in vacation." This provision was carried *verbatim* into Section 1, Chapter 157, Barnes' Code of West Virginia, 1923, and later, with slight changes, was incorporated in Section 1, Article 2, Chapter 52, of the Official Code of West Virginia, 1931, (Michie's West Virginia Code, 1949, Anno., Serial Section 5286).

Section 9, Chapter XXVIII, Acts of the Legislature, 1893, creating the criminal court of Cabell County, later the Common Pleas Court of Cabell County, gave to the court the power and imposed on it the duties which circuit courts have. The provision of Code, 52-2-1, that "the circuit court of any county in which there may be a criminal court whose jurisdiction includes the trial of felony cases, by an order entered of record, may dispense with the grand jury for all the terms of such circuit court required by law to be held in such county annually", has no application to the Common Pleas Court of Cabell County.

Unlike the Virginia statute, Sections 19-122 to 124, Code of Virginia, 1950, which provides for both regular and special grand juries, Section 9, Chapter XXVIII, Acts of the Legislature, 1893, creating the criminal court of Cabell County, and Code, 52-2, which embraces the general statutory law of this State involving the impanelling of and dispensing with grand juries, contain no such provision,

and neither of these statutory provisions contains any provision expressly empowering the common pleas court of Cabell County to convene more than one grand jury at the same term of court.

In this jurisdiction, however, "Another grand jury may be ordered at the same term either: (1) If before the close of the session the grand jury have brought in all their bills and are discharged, and a new offense is committed, or an offender is brought in; or (2) where a grand inquest is necessary to inquire into concealment of another grand inquest." 9 M. J., Grand Jury, Section 39, citing *Eastham* v. *Holt,* 43 W. Va. 599, 27 S. E. 883. In the *Eastham* case it was held that Chapter CLVII, Sections 9 and 10 (Warth's Code of West Virginia, 1891, 3d ed., now Code, 52-2-9 and 10) should be construed as showing the legislative intendment that a court having criminal jurisdiction should have the power to summon more than one grand jury at the same term of court, when necessity requires. Code, 52-2-9 and 10, read:

> "(9) Although a bill of indictment be returned not a true bill, another bill of indictment against the same person for the same offense may be sent to and acted on by the same or another grand jury.

> "(10) If the foreman or any grand juror be unable or fail to attend after being sworn, another may be sworn in his stead. And when one grand juror has been discharged, another may, by order of the court, be summoned to attend at the same term."

And further in the *Eastham* case, this Court, in holding that there is nothing in the statutory or common law of this State which forbids three grand juries at the same term of court, speaking through Judge Brannon, said that the courts of this State, having criminal jurisdiction, have the inherent power under the common law to convene more than one grand jury during the same term. At page 604 of the opinion in the *Eastham* case, Judge Brannon said: "It is clear that a criminal court possesses at common law, without statute, inherent power to impanel

grand juries, and I know no limit; but I know, * * * that it can summon new grand juries at the same term, and this inherent power carries the ability to summon new ones as often as necessity exists." In arriving at the holding in the *Eastham* case, this Court relied upon the Virginia cases of *Commonwealth* v. *Burton* (1832) 4 Leigh. 645; and *Shinn* v. *Commonwealth* (1879), 32 Gratt. 899. In the *Burton* case the Virginia Court, at page 646 of the opinion, said: "In the absence then of all statutory provision on the subject, the courts of criminal jurisdiction in Virginia, might have caused grand juries to be summoned and impaneled whenever and as often as the business before them required." The Court then held that this inherent common law power was not taken away by the Virginia statute.

We are, therefore, of opinion that the fact that the grand jury was convened and impanelled for the June, 1950, term of court on June 5, 1950, and discharged on June 6, 1950, did not prevent the Common Pleas Court of Cabell County, by its order of July 26, 1950, drawing another grand jury.

The second ground of attack set forth in defendant's plea in abatement presents a serious jurisdictional question. The order of the common pleas court, entered on July 26, 1950, directed the clerk of that court to issue a *venire facias,* returnable July 28, 1950, at nine o'clock a. m., commanding the jury commissioners of the common pleas court to convene and draw from the grand jury box the names of sixteen qualified citizens to act as grand jurors.

Evidently the jury commissioners of the Common Pleas Court of Cabell County were Elmer Canterbury and Robert S. White. That the Clerk of the Common Pleas Court, in the absence and failure of Elmer Canterbury to appear, he not having been served, appointed C. M. Gohen in his place as a jury commissioner, appears from the order of the Common Pleas Court of Cabell County, entered on August 7, 1950, which, over the signature of

the Honorable H. C. Warth, Judge of that court, ordered that C. H. Gohen be allowed five dollars for his services as a "special Jury Commissioner." The order recites that "On the 7th day of August, 1950 came M. C. Blake, Clerk of this Court, and represented that in the absence of Elmer Canterbury, the Regularly appointed Jury Commissioner of this court, he appointed C. M. Gohen, as Special Jury Commissioner to select and draw a grand Jury". But the list of the names of the grand jurors, which constituted the grand jury that returned this indictment, was certified by "M. C. Blake, Clerk of the Common Pleas Court of Cabell County, West Virginia, and Charles M. Gohen and Robert S. White, Jury Commissioners of Cabell County, West Virginia." Attached to this certificate is the certificate of M. E. Midkiff, Sheriff of Cabell County, certifying that the list of grand jurors embraced in the certificate of Blake, clerk, and Gohen and White, jury commissioners, was delivered to him "by M. C. Blake, Clerk of the Common Pleas Court of Cabell County, West Virginia, and C. M. Gohen & Robert S. White, jury Commissioners of Cabell County, West Virginia."

The appointment by the Clerk of the Common Pleas Court of Cabell County of Gohen in the place of the regular jury commissioner, Elmer Canterbury, who was absent, is in direct contravention of Code, 52-1-3, which provides that:

"There shall be two jury commissioners of the circuit court of each county. * * * They shall be appointed by the circuit court, or the judge thereof in vacation, of their respective counties. * * * Vacancies caused by death, resignation or otherwise, shall be filled for the unexpired term in the same manner as the original appointments. * * *

"There shall be two jury commissioners for every court of limited jurisdiction, who shall be appointed by such courts, or the judges thereof in vacation, respectively, * * *."

Though it has been held that some of the provisions of Code, 52-1-3, are directory, such as the failure of a jury

commissioner, regularly appointed by the court, and who is otherwise qualified to take the oath provided by Section 3, *State* v. *Medley*, 66 W. Va. 216, 66 S. E. 358, error dismissed, *Medley* v. *State* of *West Virginia*, 226 U. S. 605, 33 S. Ct. 325, 57 L. ed. 378, the performance of acts within the four-year term, prescribed by Section 3 for jury commissioners, *State* v. *Huff*, 80 W. Va. 468, 472, 92 S. E. 681, 5 A. L. R. 410n, it has never been held by this Court that the provision that jury commissioners shall be appointed by the court of which they are commissioners, is merely directory. In *State* v. *Mounts*, 36 W. Va. 179, 184, 14 S. E. 407, 15 L. R. A. 243, 49 L. R. A. 244 n, this Court held that jury commissioners, like jurors themselves, "go to make up a part of the judicial machinery", and are in a sense officers of the court appointing them. Code, 52-1-3, evidences a clear legislative intendment that jury commissioners shall be appointed by the trial court in which they are to serve as such. If we should hold otherwise there would be no responsible authority to appoint jury commissioners. If the clerk of the court in which a vacancy occurs should be held to have the right to appoint a jury commissioner or commissioners to fill vacancies in the face of the express mandatory provisions of Code, 52-1-3, we might be compelled to say that the sheriff of a county who, like the clerk of a court, is an officer of the court, might make such appointment. Such divided authority is not consonant with good government, and would tend to undermine the integrity of grand juries of the courts in this State having criminal jurisdiction.

Counsel for the State, however, cite Code, 52-1-3, and Code, 52-1-11, as amended by Section 11, Article 1, Chapter 81, Acts of the Legislature, 1945, as vesting authority in the clerk of the Common Pleas Court of Cabell County to appoint a special jury commissioner or commissioners, if either or both of the regular jury commissioners fails to attend, as required by the summons issued by the clerk of that court. Code, 52-1-3, provides, "Vacancies caused by death, resignation, or otherwise, shall be filled for the unexpired term in the same manner as the original

appointments." And this section of the Code provides that the jury commissioners of a court shall be appointed by the court. The pertinent provision of Code, 52-1-11, as amended and reenacted by Section 11, Article 1, Chapter 81, Acts of the Legislature, 1945, reads: "If either, or both, of the jury commissioners fail to attend as required by such summons, the clerk of the circuit court shall appoint a special jury commissioner or commissioners, having the qualifications herein required, to act in his or their place and stead, for the time being, and such jurors shall be drawn by such commissioners * * *."

Counsel for the State asserts that Elmer Canterbury having failed to attend, as required by the summons issued by the Clerk of the Common Pleas Court, the clerk had power to appoint Gohen in his place; but, in our opinion, the premise assumed by counsel for the State does not meet the facts in this case, for Elmer Canterbury did not "fail to attend as required by such summons": he was not summoned, and, therefore, was not required to attend. But we are further of the opinion that Code, 52-1-11, as amended and reenacted by Section 11, Article 1, Chapter 81, Acts of the Legislature, 1945, has no application to grand jurors. We say this because Chapter 52 is divided into two articles: "ARTICLE 1. Petit Juries", and "ARTICLE 2. Grand Juries"; and, further, Code, 52-2-2, provides that "The jury commissioners appointed under the provisions of section three of article one of this chapter shall select and draw persons for grand juries." Code, 52-2, in our opinion, evidences a legislative intent that jury commissioners shall be appointed under Code, 52-1-3, by the court of which they are such jury commissioners; and Section 3 provides that vacancies caused by death, resignation or otherwise, "shall be filled for the unexpired term in the same manner as the original appointments", that is by the court and not the clerk thereof.

The Attorney General seems to place particular reliance on the provision of Code, 52-2-3, which reads: "The provisions of article one of this chapter relating to the draw-

ing and summoning of petit jurors and drawing ballots and cancellation and marking thereof, so far as applicable and not inconsistent with the provisions of this article, shall be observed and govern the selection of a grand jury * * *." But Section 3 of Code, 52-1, alone governs the "Appointment and Qualification of Jury Commissioners." If the Legislature had intended that Code, 52-1-11, as amended by Section 11, Article 1, Chapter 81, Acts of the Legislature, 1945, would also govern the appointment of jury commissioners, and authorize the clerk, where a vacancy occurs, to appoint a special jury commissioner to draw names for the grand jury, it would have incorporated in the statute a provision to that effect, but it did not, and that being so, we are not at liberty to apply that section to the instant case.

For the foregoing reasons we are of opinion that the appointment of C. M. Gohen by the Clerk of the Common Pleas Court of Cabell County to fill the vacancy caused by the absence of the regular jury commissioner, Elmer Canterbury, goes to the very integrity of the grand jury itself which rendered this indictment; that such grand jury, therefore, was not legally constituted; and the purported jury commissioners not being lawfully constituted did a futile act when they drew the grand jury which returned this indictment. The indictment is therefore void.

Defendant's position that the demurrer to the indictment should have been sustained because it charges defendant with aiding and abetting the illegal sale of alcoholic liquor without a State license without stating the name of the principal aided and abetted, if known, and, if unknown, without so alleging, presents a question unusual in this jurisdiction, because the charge of aiding and abetting is coupled in the same count with the charge that defendant sold alcoholic liquor contrary to statute. If the defendant was indicted on the sole charge of aiding and abetting, the indictment is not good on demurrer; and if the indictment had charged in separate counts that defendant illegally sold alcoholic liquor and aided and

abetted in the illegal sale of alcoholic liquor, a demurrer, if interposed to the count charging the defendant with aiding and abetting such sale of alcoholic liquor should have been sustained, and the State would have been entitled to proceed to trial on the good count. In *State* v. *Stone,* 109 W. Va. 721, 156 S. E. 80, this Court held that an indictment charging a defendant with aiding and abetting one in the commission of a crime should name the principal, if known, or if unknown, such fact should be alleged. In the syllabus this Court held that: "An indictment charging one with aiding and abetting the ownership, operation, and maintenance of a moonshine still, should state the name of the principal, if known; and if unknown, this should be alleged." In writing that part of the opinion holding that the count of the indictment in the *Stone* case, in which the defendants were charged with aiding and abetting in the commission of the crime was demurrable, Judge Hatcher relied on Section 14, Article III, of the West Virginia Constitution, which reads, in part: "In all such trials [criminal trials], the accused shall be fully and plainly informed of the character and cause of the accusation, and be confronted with the witnesses against him, \* \* \*." In this regard the Court said: "Therefore, the *full information* of the character of the accusation which section 14, Article III of the Constitution requires, necessarily includes the name of the one, if known, whom the accused is charged with aiding and abetting. If the name is not known 'that fact should appear, and the facts of aiding and abetting set forth.' *Taylor* v. *Com.,* 28 Ky. L. Rep. 819, 90 S. W. 581, 31 C. J. p. 738, sec. 288." Notwithstanding the instant indictment follows *verbatim* the language of the statute, Section 7, Article VI, Chapter 77, Acts of the Legislature, 1943, amending and reenacting Section 7, Article VI, Chapter 4, Acts of the Legislature, 1935, which repealed Chapter 60 of the Code of West Virginia, as amended, and enacted in lieu thereof a new Chapter 60 providing for State control of alcoholic liquor, the indictment does not sufficiently charge the defendant with the crime of aiding and abetting in the illegal sale of

alcoholic liquor, under the holding of this Court in the *Stone* case. In *Scott v. Harshbarger,* 116 W. Va. 300, 180 S. E. 187; *State v. McGinnis,* 116 W. Va. 473, 181 S. E. 820, syl. 1; and *State v. Ray,* 122 W. Va. 39, 7 S. E. 2d 654, this Court held that an indictment, although based upon the form prescribed by the statute, which omits one of the elements of the offense defined by the statute, is demurrable. *A fortiori,* an indictment based upon the statutory form which does not conform to the provisions of the West Virginia Constitution, in this case Section 14, Article III thereof, does not effectively charge the defendant with aiding and abetting in the commission of the crime in question.

So it follows that the instant indictment, though it sufficiently charges the defendant with the crime of illegally selling alcoholic liquor, is insufficient to sustain a conviction on the basis that the defendant aided and abetted in such illegal sale.

What then is the effect of defendant's demurrer to this indictment? The demurrer is general in its terms, but even if it had been specifically directed to the defective part of this indictment, it still under our present practice must be regarded as a general demurrer. "Special demurrers do not obtain in criminal procedure in this jurisdiction." *State v. DeBoard,* 119 W. Va. 396, pt. 2 syl., 194 S. E. 349.

Though it has been held in *State v. Gould,* 26 W. Va. 258, pt. 2 syl., that "No two of these several and distinct offences [misdemeanors] can be united in one count of an indictment without rendering it fatally defective," the demurrer to this indictment should not be sustained on such ground. The rule, presently prevailing in this jurisdiction, is that a demurrer to or a motion to quash a count of an indictment will not be sustained on the ground that the count is faulty because it charges the commission of two or more offences of the same general nature. *State v. Miller,* 89 W. Va. 84, pt. 3 syl., 108 S. E. 487. See also *State v. Digman,* 121 W. Va. 499, 5 S. E. 2d 113.

In *State* v. *Vaughan,* 93 W. Va. 419, 117 S. E. 127, this Court held in point 5 of the syllabus: "* * * and a count in an indictment charging the commission of two or more misdemeanors, though faulty because of duplicity, is not subject to demurrer or motion to quash on that ground." In point 1 of the syllabus in the *Gould* case, this Court, in appraising an indictment based upon Section 1, Chapter 74, Acts of the Legislature, 1875, which provided, in part that: " '* * * if any person shall over-drive, torture, torment, deprive of necessary sustenance, or unnecessarily, or cruelly beat, or needlessly mutilate, or kill any domestic animal, * * * every such offender shall for every such offence be deemed guilty of a "misdemeanor",' ", held that the statute "creates seven separate and distinct offences of a similar character." But in point 3 of the syllabus of the *Gould* case the Court held: "But the adding in any one count for over-driving, over-loading or depriving of necessary sustenance or unnecessarily or cruelly beating or needlessly mutilating or killing, the words and torture and torment or either of them, would not cause such count to be fatally defective as including a charge of more than one offence in a single count, the added words torture and torment would be mere surplusage." While there may be an inconsistency between point 1 of the syllabus and point 3 of the syllabus in the *Gould* case, such apparent inconsistency need not be considered for the purpose of deciding this case. In the first place the broad language in point 5 of the syllabus in the *Vaughan* case approves the joining of two or more misdemeanors in a single count of an indictment. The rule, however, is otherwise where the same count of an indictment charges separate felonies. *State* v. *Wiseman,* 98 W. Va. 250, 126 S. E. 701. Secondly, the instant indictment does not charge defendant with two distinct offenses: it effectively charges defendant with the illegal sale of alcoholic liquor without a State license, and ineffectively charges defendant with illegally aiding and abetting in the sale of alcoholic liquor without a State license. The allegations of the indictment bearing on the purported

charge of aiding and abetting are not sufficient to charge the offense, so that, in our opinion, those allegations may be regarded as surplusage, just as this Court in point 3 of the syllabus in the *Gould* case held that the adding of the words in one count "and torture and torment or either of them" would be mere surplusage. Even if the charge of aiding and abetting had been properly pleaded in the indictment, the indictment would not charge two distinct offenses. Both the charge of the illegal sale of alcoholic liquor without a State license, and the charge of aiding and abetting in such sale are part and parcel of Section 7, Article VI, Chapter 77, Acts of the Legislature, 1943, amending and reenacting Section 7, Article VI, Chapter 4, Acts of the Legislature, 1935, which repealed Chapter 60 of the Code of West Virginia, as amended, and enacted in lieu thereof a new Chapter 60. The punishment for each of the two offenses is the same. The two offenses are set forth in the same section of the statute, Section 7, and the statute was enacted as a general statute to set up control of alcoholic liquor in this State. Moreover, this indictment is in the form prescribed by Section 7 of the statute, and the very statute itself bars any attack on the indictment on the ground of duplicity.

The trial court, in our opinion, properly overruled the demurrer to the indictment and the State was entitled to proceed to trial on that part of the indictment, which charges the illegal sale of alcoholic liquor without a State license.

The defendant in this case made no motion at the close of the State's evidence that the State be required to elect. In fact, the defendant was not in a position safely to make such a motion, because only where two or more charges are contained in an indictment, which are sufficient in law, is it to the interest of the defendant to move for an election. Certainly, counsel for defendant acted discreetly in not moving to require the State to elect between the allegation of the indictment which effectively charges the crime and that which does not.

Be that as it may, the State under this indictment was not entitled to have a conviction of the defendant for the crime of aiding and abetting in the illegal sale of alcoholic liquor.

This brings us to the question of the sufficiency of the evidence and whether defendant's motion that the verdict be set aside and a new trial awarded was properly overruled.

It would indeed be repetitious for us, in the consideration of the question of the sufficiency of the evidence, to repeat in detail what has already been set forth in this opinion in the statement of facts. Suffice to say that no witness, not even the witness Paul Brown, an investigator employed by the office of the Prosecuting Attorney of Cabell County, testified as to any sale by the defendant of whiskey or any other alcoholic liquor at the Oriole Club. Specifically and in detail, under the pressing cross examination of counsel for defendant, this witness testified that on the occasions of his investigating visits to the Oriole Club, in the course of his employment, he never saw defendant sell, mix or have in his possession any alcoholic liquor; and witness after witness for defendant, including members of the Oriole Club, the band which played for its dances, members of the women's auxiliary of the club, twenty in number, as well as the several members of the Department of Public Safety, who participated in the raid on the Oriole Club on the night of August 1, 1950, testified that on the occasions they were in the Oriole Club they did not see defendant engaged in the sale, mixing or possession of any alcoholic liquor. In this jurisdiction in a criminal prosecution the guilt of a defendant must be proved by the State beyond a reasonable doubt. *State* v. *Young,* 134 W. Va. 771, 61 S. E. 2d 734; *State* v. *Hudson,* 128 W. Va. 655, 37 S. E. 2d 553, 163 A. L. R. 1265; *State* v. *McHenry,* 93 W. Va. 396, 117 S. E. 143.

In this case no substantial proof was adduced in support of the charge in the indictment as to the illegal sale of alcoholic liquor, so the court of common pleas should have

sustained the defendant's motion to set aside the verdict and grant a new trial for this reason.

The trial court, in our opinion, properly overruled the defendant's motion to quash the indictment because it states that it "was found upon the testimony of Paul Pritchard," a member of the Department of Public Safety, who testified at the trial that he never appeared before the grand jury. Code, 52-2-7, which provides for the duties of the grand jury and the preservation of the evidence adduced before it, provides that "They [the grand jurors] shall appoint one of their number as clerk, who shall write down the name of each witness examined by them, * * * and furnish the same to the prosecuting attorney"; and Code, 52-2-8, provides that an indictment or presentment may be made upon the information of two or more of the grand jurors, and when a presentment or indictment is made upon such information, or on the testimony of witnesses called by the grand jury, or sent to it by the court, "the names of the grand jurors giving the information, or of the witnesses, shall be written at the foot of the presentment or indictment." Such provisions have been held to be directory in this jurisdiction. In *State* v. *Joseph,* 100 W. Va. 213, pt. 3 syl., 130 S. E. 451, this Court held: "The statute directing the names of the witnesses, on whose evidence the indictment was found, to be written at the foot thereof, is directory, and the omission of such names does not vitiate the indictment." To like effect see *State* v. *Enoch,* 26 W. Va. 253, pt. 2 syl. If the provisions of Code, 52-2-7, providing that the clerk appointed by the grand jury shall write down the name of each witness examined by the grand jury and furnish the same to the prosecuting attorney, and the provision of Code, 52-2-8, providing that the names of the grand jurors giving the information upon which the indictment is made, or the witnesses who testified before the grand jury, shall be written at the foot of the presentment or indictment are directory, the fact that Corporal Pritchard's name was erroneously copied into the indictment does not vitiate it.

And, finally, it is our opinion that the trial court erred in the giving of State's Instructions Nos. One, Two, Three and Four.

State's Instructions Nos. One, Two and Four are prejudicially erroneous because they were directed to the defective charge in the indictment that defendant aided and abetted in the illegal sale of alcoholic liquor; and the giving of State's Instruction No. Three was error because that instruction, though abstract in form, incorrectly states the law of this jurisdiction governing the keeping and possession of alcoholic liquors, and is not applicable to this case. This instruction reads: "The court further instructs the jury that it is unlawful for a person to keep or possess lawfully acquired alcoholic liquors in any quantity, however small, at any place other than his residence and for the personal use of himself, his family, his servants or his guests." It was error for the trial court to give this instruction because (1) there is no evidence that the defendant had any alcoholic liquor in his possession; and (2) the instruction excludes instances and circumstances in which it is lawful for a person to keep or possess lawfully acquired liquors at a place other than his residence.

For the reason that the indictment under which the defendant was convicted is void, on the ground that the jury which returned it was illegally constituted, we reverse the judgments of the Circuit and Common Pleas Courts of Cabell County, set aside the verdict, and remand this case to the Common Pleas Court of Cabell County with direction that the indictment be quashed.

In view of our holding in this case, the other questions presented, bearing on the demurrer to the indictment, the sufficiency of the evidence, and the giving of State's Instructions Nos. One, Two, Three and Four, in strict propriety were not reached. They have, however, been discussed with a view that in the event another indictment is obtained pertaining to the matters embraced in this record, the State will not fall into the errors involving

the criminal practice and proceedings in this State, which this record presents.

> *Judgments reversed; verdict set aside; case remanded with direction to quash the indictment.*